STATE OF NORTH CAROLINA *v.* THE RICHMOND & DANVILLE RAILROAD CO., A. S. BUFORD, and others.*

The North Carolina Railroad Company is invested by its charter, with full authority to lease its road, with power to the lessee to change the gauge thereof.

BYNUM J. *dissenting.*

This was a CIVIL ACTION, applying for an *Injunction*, heard by his Honor Judge *Albertson*, at Chambers, in WAKE county, at Spring Term, 1875.

Attorney General Hargrove, for and on behalf of the State, on the 9th of April, 1873, sued out a summons from Wake Superior Court, and at the same time filed a complaint, in which, among other things, it was alleged :

That on the 11th of September, 1871, the North Carolina Railroad Company, in which the State was interested as a large stockholder, leased its road, without authority of law, to the Richmond & Danville Railroad Company, and that the latter company, by its agents, officers, &c., has possession of the road ; that such road is a public highway, and that the whole State is interested therein.

*Note: Justice RODMAN did not sit in this case, by reason of his owning some shares of stock in the North Carolina Railroad Company.

That the defendants, the Richmond & Danville Road and others, are about to change the gauge of the N. C. Road, between the towns of Greensboro and Charlotte, so as to make it different from that of the other portions of the road ; and that such change of gauge would greatly damage the whole State and its citizens, and is in no wise warranted by law.

Wherefore plaintiff demands judgment, &c., and praying for a perpetual injunction.

Judge Watts granted the restraining order until the hearing, which was had before Judge Albertson, at Spring Term, 1873.

The defendants appeared and answered, insisting : that the State could not as a plaintiff, maintain an action of this nature. That the North Carolina Railroad, by its charter, was authorized to lease its road and property; and that at the time of making the lease complained of, the State was represented in the meeting, by its Directors, who sanctioned the same, as did also the Directors representing the interest of the private stockholders.

Defendants further said, that they did propose to change the gauge of the North Carolina road, so as to make it harmonize with the tracks of the connecting roads, north and south of the places referred to in the complaint, insisting that such contemplated change would not endamage the State or any of its citizens, but on the contrary, such change would greatly promote the State's interest, and facilitate travel and the transportation of freight from place to place.

Upon the hearing, the defendants moved to vacate the injunction theretofore granted, having given the necessary notice of such motion to the plaintiff.

His Honor refused the motion, and ordered the injunction to be continued until the hearing, upon the condition that the plaintiff enter into bond in the sum of $50,000, conditioned to pay the defendants all such costs and damages as they may incur by the wrongful suing out of this injunction.

From the order continuing the injunction, the defendants appealed.

*Badger* and *Merrimon, Fuller & Ashe,* for appellants.
*Attorney General Hargrove* and *Smith & Strong,* contra.

SETTLE, J.    On the 11th day of September, 1871, the North Carolina Railroad Company leased its road to the Richmond and Danville Railroad Company for the term of thirty years, with leave to change the gauge of the said railroad track, upon condition that if the lessees did change the gauge, they should change it back to what it is now at the termination of the said lease, if required to do so by the lessors.

This action involves the determination of two questions :

1. Is the lease valid ?

2. Is there anything in the law or public policy of North Carolina which forbids a change of gauge ?

We have had the benefit of able and elaborate arguments upon the questions presented, but I may remark here, that most of the autorities cited have no application to the case at bar, for the reason that the questions here involved are to be determined by a construction of the charter of the North Carolina Railroad Company and our general legislation on the subject of railroads.    These questions necessarily depend upon our statutes, and of course, cases determined upon other and different statutes can afford but little assistance in reaching a proper conclusion.    In most instances they only tend to confuse.    We admit the proposition, in its broadest sense, that the lease is void unless it be sanctioned by the legislation of both North Carolina and Virginia.    The charter of the North Carolina Railroad Company is one of the most liberal ever granted in this State.    We will not attempt to enumerate the privileges and powers conferred by it, further than to say that the Company was authorized to construct a railroad, with one or more tracks, without restriction as to gauge, and that they are expressly authorized, whenever they see fit, to farm out their right of transportation over said railroad ; and the rights and duties of their lessees are further recognized, defined and placed upon an equality with themselves, by enacting that said Com-

pany and every person who may have received from them the right of transportation of goods, wares and produce on the said railroad, shall be deemed and taken to be a common carrier as respects all goods, wares, produce and merchandise entrusted to them for transportation.

This is an express grant of power from the State to the Company to lease their road whenever they see fit to do so, for we see no reason why a forced construction should be put upon the words "farm out" in order to divest them of their plain and obvious meaning, which is, in this connection, *to lease.*

Can any reason be suggested why the power to lease should not have been conferred upon the Company, since by the general law of the State, the whole road, with its franchise and all the rights and privileges thereof, together with all its corporate property, real and personal, might have been sold under execution for debt and conveyed by deed to the highest bidder? Rev. Code, chap. 26, sec. 9, *et seq.*

This legislation, taken in connection with the Act of 1871–72, chap. 138, known as the free railroad law, under which railroads may be constructed anywhere in North Carolina, and all roads, as well those already built as those to be constructed, are authorized to consolidate with other connecting roads, whether in or out of the State, shows conclusively that there is no policy in North Carolina which forbids the contract that has been entered into by these two Companies.

It is conceded that the Legislature of Virginia has authorized the Richmond and Danville Railroad Company to take this lease by an act passed on the 15th day of February, 1866, entitled "An act to authorize the Richmond and Danville Railroad Company to lease, hold and operate the Piedmont Railroad," and by an act amendatory of the above recited act, approved July the 11th, 1870.

Since, then, the contract of lease is authorized by the legislation of both States, there is no foundation upon which the further objection that the Richmond and Danville Railroad Company is a foreign corporation can rest.

There is no wall around North Carolina to exclude foreign corporations from entering the State and doing business here. On the contrary, it has been our policy to invite them in.

. This is abundantly evidenced by the presence, for years in our midst, of almost every conceivable form of foreign corporations.

The rights of express, telegraph, insurance, mining, manufacturing and railroad companies, from other States, are daily recognized in our Courts, and by our Legislature, which has heretofore welcomed them, not only as profitable sources of revenue, but more especially as useful agents in developing the wealth and resources of the State.

It appears from the exhibits in this action, and it is also a matter of history, that the Richmond and Danville Railroad Company has been, since 1866, without objection, controlling and operating the Piedmont Railroad, nearly all of which lies within the limits of the State.

Whatever may have once been thought of the policy of excluding foreign corporations, the increasing demands of commerce have liberalized our ideas on the subject, and taught us to open our doors to all persons, natural and artificial, who wish to engage in honest business. This spirit of liberality is called the comity of nations, and it generally keeps pace with the civilization of a State, being re cognized where wealth and intelligence characterize a people, and denied in barbarous counties.

Since the decision of the Supreme Court of the United States, in the *Bank of Augusta* v. *Earle*, 13 Pet., 519, this comity of nations has been accepted, in its most liberal sense, by the States of this Union. In that case, Taney, C. J., delivering the opinion of the Court, says : " The comity thus extended to other nations is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered, and is inadmissibly when contrary to its policy, or prejudicial to its interest. But it contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the

sovereignties to which they belong, that Courts of justice have continually acted upon it as a part of the voluntary law of nations." And he quotes with approbation the following passage from Story's Conflict of Laws : " In the silence of any positive rule affirming, or denying, or restraining the operation of foreign laws, Courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy, or prejudicial to its interest."

In the same opinion, it is said " the intimate union of these States, as members of the same great political family, the deep and vital interests which bind them so closely together, should lead us, in the absence of proof to the contrary, to presume a greater degree of comity, and friendship, and kindness towards one another, than we should be authorized to presume between foreign nations."

We now come to the consideration of the second question : Is there any law or policy in North Carolina which forbids a change of gauge ? There is no restriction in the charter, as to gauge, but the company was left free to adopt such gauge as would best promote their interests. But it is said that as other roads have been required to adopt the gauge of the North Carolina Railroad, that company is not now at liberty to change its gauge. Freedom to adopt any gauge was the grant of the sovereign to the North Carolina Railroad Company. How can that grant be revoked or qualified by provisions in the charters of other roads, with which the North Carolina Railroad has no community of interests, and whose purposes may be antagonistic to her own ?

It is certainly a novel idea that a charter without restriction is to be subjected to all the burdens of other charters with restrictions. If we may import this restriction into the free charter, what is to prevent us from importing all other restrictions, in all other charters, which some one may imagine is in furtherance of a public policy ?

But what is to become of this supposed public policy under the operation of the free railroad law, which allows any other

roads to connect with the North Carolina Railroad at any point, and with any gauge they may see proper to adopt?

Our conclusion is, that the North Carolina Railroad Company not only had power, under their charter, to adopt originally such gauge, as in their discretion, would best promote their interest, but that if in the course of time another and a different gauge, either for the whole or only a portion of the road should be thought more advantageous, they were left free to change it at pleasure. We have seen that the North Carolina Railroad Company have leased their road to another Company with express permission to change the gauge if this other Company shall see proper to do so. This confers upon the leasee all the rights in this respect which were possessed by the lessor.

And now the Richmond and Danville Railroad Company say that the demands of trade and travel require a change of gauge on that portion of the road lying between Greensboro' and Charlotte, in consequence of the connections North and South of those points having a different gauge from that now in use on the North Carolina Railroad. Since the lease is valid, it is well that it clothes the lessee with large powers, such as to change shops, tracks, houses, &c., for it is to the interest of the public that a Company, undertaking to meet the responsibilities of a common carrier, should not be trammelled and embarrassed by restrictions which would prevent them from properly executing their duties.

There was error in the order of injunction restraining the Richmond and Danville Railroad Company from changing the gauge of the North Carolina Railroad between Greensboro' and Charlotte, and the same is hereby dissolved.

BYNUM J. (*dissenting.*) I cannot concur in the opinion of the Court, and as the principles involved in the decision are of great magnitude and consequence, I deem it my duty to give the reasons for my dissent.

The question presented is, has the Richmond & Danville

Railroad Company, a corporation created and existing by the laws of Virginia, under the claim of lease made to it by the North Carolina Railroad Company, a corporation created and existing by the laws of North Carolina, the right to change the gauge of the latter road ? The affirmative of this question is upon the defendant company which claims the right; it must therefore, establish two propositions; first, that the right to change the gauge was vested in the North Carolina Company, and second, that it was capable of assignment to the defendant company, and was assigned to it.

1. It is not denied by the defendant, that if the charter of the North Carolina road, established a particular gauge, either in express terms or by necessary implication, then neither the road nor the defendant its assignee, has the right to change it. But the defendant says, that the charter of the North Carolina road, contains no provision whatever, as to gauge, and from this absence of any provision, the defendant claims to derive all power, both to select a gauge and to change it at will. It is true that where a railroad charter prescribes no gauge, the company has the right to adopt one, because a track is essential to the purposes of its creation. But it does not follow that a company having once exercised the power and fixed a gauge, can change it at pleasure; because this is not essential to the purposes of its creation, and in the case before us, is not alleged to be. For says Chief J. MARSHALL " a corporation being a creature of the law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence." 4. Wheat. 636.

A road may not therefore, exercise all powers that are convenient or profitable to it, but only those that are essential, unless the powers are expressly conferred in the charter. But in this case it is not so much as alleged, that the proposed change of gauge, is even convenient to, or desired by the people of this State, who own two-thirds of the road, and whose supposed benefit, was the consideration for the grant of the franchise. The defendant then, upon whom the burden rests,

41

utterly fails to show the right to alter the gauge, either by the express provisions of the charter, or by necessary implication. But shift the burden now from the defendant to the plaintiff, and without resorting to technical criticisms to ascertain the true powers of this corporation, it most clearly appears from its provisions, that the gauge of the road is *fixed* in the charter.

The North Carolina Railroad Company was incorporated in 1849. At that time there were but two other railroads in the State, both of which were of the gauge of 4 feet 8½ inches, to-wit : the Wilmington & Weldon, and the Raleigh & Gaston, both leading to the Virginia line and there connecting with roads of that State, of the same gauge, one leading to Norfolk and the other to Petersburg. I am not informed that there was at that time, in Virginia or north of that State, any road of a different gauge. In view of and in reference to all this, the legislature of this State incorporated the " North Carolina Railroad Company." The first section of the Act expressly provides " for effecting a railroad communication between the Wilmington & Weldon Railroad where the same passes over the Neuse river, in the county of Wayne and Charlotte." By the 52d section, it is provided as follows : " That the owners, proprietors, and authorities of the Raleigh & Gaston Railroad, shall be and they are hereby authorized and empowered, *to effect a junction and actual connexion*, with the said North Carolina Railroad, at such point at or in the vicinity of Raleigh, as they in their discretion may select." And by the 50th section it is provided ; " That one of the conditions of this charter is, that this General Assembly shall have power to establish, regulate and control the intercourse between the North Carolina Railroad, and the Raleigh & Gaston Railroad, so as *best to secure an easy and convenient passage of persons and property.*

These sections of the charter of the North Carolina road, so clear and unequivocal in meaning, seem to have been overlooked. They have, and can have but one meaning. The corporators accepted the charter with these stipulations, which are

made an essential part of the contract. It was impossible to comply with these conditions without making this road of the same gauge with the Raleigh & Gaston and the Wilmington & Weldon roads. All parties so understood it then, as shown by their contemporaneous action. The North Carolina road was constructed of the same gauge, and by the concurrent act of the three roads, "the junctions" were formed, and the "actual connexions" made, as they were expressly required to be by the charter. If the act of incorporation had contained the words, "The gauge of this road shall be four feet 8½ inches," the meaning would not have been plainer, or the duty of making the gauge more binding. What other reasonable construction can be put upon them?. A railroad charter, as other instruments, is to be construed by looking at all its parts, and thus examined, to my mind, it is impossible to say that the charter itself does not clearly fix the gauge of this road.

But if there could be any doubt as to this construction, arising out of any ambiguity in the charter, it is put to rest by the general legislation and policy of the State, which this Court must judicially notice for guidance, in cases of doubt.

It has been urged that the State has no policy in respect to gauge, because two roads have been allowed to penetrate the State with a five feet gauge. But such a deviation is no departure from, but is in harmony with a policy which allows the ingress of foreign corporations, even with their own tracks, provided they do not dismantle our own roads and system, constructed for the convenience of the people of this State, in their territorial intercourse. Such considerations cannot affect an argument which is derived from the general scope of legislation as to the railroad system of the State, and more especially as to this road, which is the proposition before us.

There are many subjects upon which the policy of the several States is abundantly evident from the nature of their institutions and the general scope of their legislation, and which do not need the aid of a positive and special law to guide the decisions of the Courts. Whenever the policy of a State is thus

manifest, the Courts of the United States would be bound to notice it, as a part of its code of laws, and to declare all contracts in the State repugnant to it to be illegal and void. *Bank of Augusta* v. *Earle*, 13 Pet., 283.

Most of the railroad charters granted by the State *prior* to that of the North Carolina Road, those granted *cotemporaneous* with the construction of this road, and those granted *since* its completion, in effect provide for, or require a connexion attainable only by a uniform gauge. At least three of the charters require that their gauge shall be four feet eight and a-half inches, and also that this gauge shall be the same as that of the North Carolina Railroad. Of these the Western North Carolina and the Atlantic & North Carolina, not only prescribe the narrow gauge, but require a connexion with the North Carolina Road by which a continuous communication was to be effected from the Atlantic to the Tennessee line. It is true these latter charters were subsequent to that of the North Carolina Road, but the policy of the State and the interests of this road were so identical that the North Carolina Road accepted these provisions by making the required connexions, and by their continuous use and enjoyment in common with the other two roads. Upon the faith of the assent of the North Carolina Road, so given, these other roads were built and connected with it by the required gauge. If the owner of property who stands by and sees it exposed to sale without warning the purchaser, is estopped from setting up title against him, much more is this road estopped from destroying valuable rights acquired, not by silent acquiescence, but by its voluntary and concurrent act in making the connexions and allowing their use. So, whether we look to the charter by a fair construction, or to the general legislation, accepted and acted on by this road, or to the will of the people as expressed by building all the railroads of the State of the same gauge, whether prescribed in their charters or not, the conclusion seems irresistible, that the State has a well defined and understood railroad policy on the subject of gauge.

It has been objected that the State, through her directors, assented to the lease and change of gauge, and is concluded thereby. But this is assuming as true the very thing that is denied, to-wit, that the directors were clothed by the charter with the powers they claimed to exercise. So, in receiving the rents of the lease the State is only taking her own, and is no more estopped than is a disseizee who receives from the disseizor, the products of his own land, while asserting his title. So far from acquiescing in the illegal act of the directors, the State is now in Court here, in her own sovereign right, demanding the protection of the Court against a violation of the charter.

No railroad scheme was ever devised by more of the wisdom and patriotism of the State. It was intended to be, in fact what it was in name, the *North Carolina* Railroad, from which, when completed from the Atlantic to the Tennessee line, should radiate a uniform system of lateral roads, connecting all parts of the State in a common brotherhood, by an easy and convenient intercommunication of trade and travel. It is the first duty of nations to provide for the welfare of their own citizens, but no selfish purpose dictated this policy. This system was not circumscribed by State lines, but reached out to the border States and sought access to their markets by conforming this State gauge to theirs, and offering to them the same avenues and facilities of trade that we provided for ourselves.

Nor is the gauge of this State local or exceptional, but as it has been adopted by four-fifths of the railroads in the United States, it may be called properly the national gauge. Nor yet is it confined to this country. As early as 1845, a royal commission was appointed by the British Parliament to investigate the subject, which, ih 1846, made an elaborate report, and concluded by recommending that the 4 feet 8½ inch gauge, be declared by the legislature, to be used in all public railways then under construction or thereafter to be constructed ; and they add that great commercial convenience would be obtained by

reducing all the broad gauge lines to the narrow gauge, and that some equitable means should be found for producing an entire uniformity of gauge, "owing," they pointedly say, "to the great evils of a break of gauge." Gillespie on Railroads, 287.

What Great Britain so earnestly sought, this State has had from the beginning, to-wit, a uniform system of roads of the most approved gauge, penetrating all parts of the State, embracing every railroad lying wholly in the State, and cementing the whole together by twelve hundred miles of connecting lines, over which commerce may pass without break of bulk or other hinderance.

In prosecuting this system, North Carolina has not only avoided the narrow and illiberal policy peculiar to barbarous countries, and which is so justly deprecated in the opinion of this Court, but keeping pace with the most advanced ideas of commerce and civilization, and profiting by the experience of the enlightened nations, has adopted that system, proved to be best when thoroughly tested, and always used where wealth and intelligence characterize a people. This State has no policy of excluding foreign corporations. Her doors are open to all persons natural or artificial, who wish to engage in honest business, but upon the same terms she prescribes for her own citizens by her laws and public policy.

To me it is a startling proposition that a foreign corporation, having no legal existence here, except by curtesy, may come self invited and break down her open doors, remove her landmarks and dismember a well knit system of public improvements, the steady growth of almost half a century. And the spirit of liberality which submits to this is called, "the comity of nations."

The immediate evils which will result to the State from this measure, are of the greatest magnitude. Now, there is an unbroken connection between all the railroads of the State, and all freights have speedy access to every market of the State without change of car. By the proposed change, the Eastern

part of the State is severed from the West as it were by a wall of partition, excluding both from the equal benefits of the roads, and forcing the commerce of the State to do one of two things, either to adopt the Richmond & Danville route, or to submit to an onerous tax for the privilege of trading in the markets of the State. If the legislature of the State should impose a tax of five per cent. upon all produce transported over the roads to any market of the State east or west of this bisecting wall, but allow it over this road exempt from taxation, it would present the practical effect of this break of gauge. This new burden will be the sum of the expense, delay and risk of breaking bulk, once certainly and often twice, *to reach a home market.* When it is considered that each break of bulk is computed to be equal to fifty miles of transportation, and when it is further considered how delicate are the laws of trade and that even a slight increase of cost or delay of carriage will often turn the whole current of trade into new channels, the evils and costly results of this disruption can be seen, and the wisdom of the State in fixing, and up to this time 'adhering to a public policy, is justified.

That the whole railroad system of this nation is tending to a uniformity of gauge, which is demanded alike by public opinion and the interest of commerce, is certain. What that gauge shall be has already been determined by the same inflexible laws. No step backward, whether dictated by the illiberal rivalries of States or corporations, can long impede or denationalize a universal necessity and a universal desire.

2. But is the lease itself valid? To make it valid requires the concurrence of two powers: 1st, the power of the lessor Company to make, and 2nd, the power of the lessee Company to take this lease. In discussing corporate powers, we are to keep steadily before us their nature and faculties, to wit: "that a corporation is precisely what the incorporating act has made it, derives all its powers from that act, and is capable of exerting its faculties only in the manner which that act authorizes. 2 Cr. 127. It is clear, and not denied, that the power to lease

is not one of the powers incidental to the existence of this cor-
poration, and that it must be an express power conferred in
the charter itself.   The defendant however claims that this
express power to lease is found in the 19th section of the char-
ter, which is as follows: Sec. 19. "That the said Company
may, when they see fit, farm out their right of transportation
over said railroad subject to the  rules  above mentioned," &c.
In the opinion of the Court it is held, that the power to farm
out the right of transportation *over* a road is the power to
lease the road itself, and under this limited and specific grant,
that the Company can, in the words of the deed of lease, "de-
mise, let, hire and farm out the entire railroad with 'all its
franchises, rights of transportation, works and property, in-
cluding its superstructure, road bed and right of way, depot
houses, shops, buildings, fixtures, engines, cars, and all fran-
chises belonging thereto."  To me this appears to be an im-
mense structure erected upon a slender foundation, and needs
at least a single decision or authority to maintain it.   A right
of transportation *over* a road is one thing, and the road itself
with its engines, shops and property is certainly another, and
these can no more be confounded than rent can be with the
land out of which it issues.   One is a right of passage over
the *corpus*, the other is the *corpus* itself.  A lease of the road
would carry the right of transportation as an incident; but
the right of transportation would not carry the road, for if so
every wagoner at at a toll gate, who buys a ticket over a turn-
pike for a year or a term of years, thereby acquires a lease of
the road and its management.   Nothing is more common than
for all roads, with connecting lines, to farm out the right of
transportation over their lines, and in this day of close con-
nections and rapid transit, the practice is indispensible to suc-
cessful business.   We every day see this right farmed out to
express companies, and by one company for the cars and freight
of another, and for special purposes.   At many of our depots
we see freight cars painted and marked the "Yellow line,"
the "Green line," the "Blue line."   What does it all mean?

These cars belong to vast incorporated companies of these names which are doing nearly all the fast transportation of the United States; yet they do not, as I am informed, own a mile of railroad. Their business is to furnish cars and freight which they agree to deliver. In order to do so, they hire or farm from the railroad companies the right of transportation over their lines at stipulated rates and speed. One company furnishes the road and motive power and farms out the right of transportation to the other company, which supplies the rolling stock and delivers the freight.

" Our ideas of a corporation, its privileges and disabilities, are derived from the English books, and we recur to them for aid in ascertaining its character. 5 Or., 87. How the term " farm out the right of transportation" came to be inserted in railway charters, and its proper construction, are seen by sketching the progress of this species of internal improvement. Railways, except as operated by steam, are not of recent origin, but have been in use for over two hundred years. Wooden railways were employed as a substitute for common roads among the mines of England and Wales, as early as 1650. Subsequently the rails were covered with plates of iron, and the rails were made wholly of iron as early as 1767. The first successful locomotive was constructed in 1814; but it was not until so recently as 1829, that steam was applied with decided success. The rapid progress of railroads since that date is well illustrated by an extract from two works.

" Nothing can do more harm to the adoption of railroads than the promulgation of such nonsense, as that we shall see locomotive engines travelling at the rate of 12, 16, 18 and 20 miles an hour. Wood on Railways, (1825.")

" An Express train on the Great Western Railway drawing 59 tons has travelled for three hours at the rate of 63 miles an hour." Ritchie on Railways, (1846.) Since then 75 miles an hour has been attained.

For a long period and until the recent application of steam, railways were extensively used for transportation in the min-

ing regions of England. Horses were the motive power ; corporations were formed then as now, which sometimes employed their own cars and power and often made it their business to furnish the road bed and franchise, and to farm out the right of transportation over the road to the individuals and companies operating the collieries and other mines, who furnished their own vehicles and horses. Thus the railroad company would often farm the right of transportation to several companies. In order to do this business, the charters of these railroad companies, had inserted in them, this power to farm out the right of transportation over their roads." When steam was introduced this practice of farming out did not cease and the clause was still retained in the charters, and even now by a general law, 8 Victoria, chap. 20, sec. 87, the power is secured to all companies to contract with other companies, for the right of transportation over their track. 1 Redf. on R. R. 587, 447.

It is thus seen, that this common *formula*, derived from the English charters and inserted in most of the railway charters of this State, following these more ancient forms, was applicable to a different purpose altogether, from a lease of the road itself.

If we turn from railways to mines and manufactures, we still find that the right to lease as claimed here, can be based upon no such *formula*. In California and Colorado for instance, nothing is more common, than for companies to make it a business to acquire water power and farm out its use to mining companies. So mills and factories are supplied with water to operate the machinery, and gas and water furnished to cities, hotels and stores. No one would conceive that such contracts could transfer the gas and water works and all control over them. Such contracts may be called "leases" and so may the powers to farm out the right of transportation over a road when exercised, but strip off the disguise of names, and the distinction between the two propositions, is as clear and well defined, as the difference between the substance and the shadow. No authority or decision is cited to sustain this lease, and we may fairly conclude that the judgment here is without

a precedent. Such a construction could not have been in the minds of the corporators and the Legislature and it is capable of the most dangerous abuse. Under the cover of a few ambiguous words, used for a different purpose, almost every road in North Carolina may be at once transferred with all their belongings, to English or German companies; and we may soon enjoy the consolation of travel on the *London & Liverpool* or the *Berlin & Amsterdam,* grand trunk railway—*North Carolina division.*

But it is asked, why may not a railroad lease out to another Company, when by the provisions of Revised Code, chap. 26, sec. 9, it may be sold to the highest bidder under execution? Admit that it can be sold under execution, and it does not show or tend to show that the State has no State policy, which is the purpose of the question; because the act cited authorizes a sale for debt only, and therefore when there is no debt there is no power of sale. Even without this statute, at common law, corporate property. like that of an individual, is liable to be sold for debt. If this were not so, a great wrong would be done under the sanction of law. So I apprehend without express power in the charter, a railroad corporation, in order to secure its completion, may mortgage the road for the funds necessary to complete it, because with out its completion, the very purpose of its creation would be defeated, and a mortgage is the necessary and usual method of obtaining the money. Such a mortgage, like the sale under execution, is considered as involuntary, and therefore they do not affect the question of public policy.

But is perfectly clear, that without a power to that effect in the charter, a railroad company can neither make a voluntary sale, lease or mortgage any more than it can bank, insure or deal in stocks; because a corporation is an artificial being, having those powers only which are expressly conferred upon it, or which are incidental to its existence; and to sell, lease, mortgage, &c., constitute no part of the object of its creation. The power to lease, therefore, being foreign to the

object of the creation of the corporation, must be shown by an express and unequivocal grant in the charter. "For," said the Court in the *Binghampton case*, 3 Wall, 51, "charters are to be construed most favorably to the State, and in all grants by the public nothing passes by implication. All rights which are asserted against the State must be clearly defined, and not raised by inference or presumption ; and if the charter is silent about a power, it does not exist. If on a fair reading of the instrument, a reasonable doubt arises as to the proper interpretation to be given to it, the doubt is to be solved in favor of the State ; and where it is susceptible of two meanings, one restricting and the other extending the power of the corporation, that construction is to be adopted which works least harm to the State."

The laws of a country have no binding force beyond its territorial limits, and their authority is admitted in other States not *proprio vigore*, but *ex comitate*, and every State will judge for itself how far this comity is to be permitted to interfere with its domestic interest and policy. 2 Kent, 457. Every power, which a corporation exercises in another State depends for its validity upon the laws of the sovereignty in which it is exercised, and it can make no valid contract without its sanction. Therefore it is not sufficient to find in the charter an express power even to lease and transfer the road with all its franchises, but if the lessee is a foreign corporation, the further power must be shown in the charter to lease and transfer the road to such corporation. The true rule, and its application to the case before us, appear to be this : When a corporation created in one State goes into another to make contracts and do business, the comity of States will permit it to do so where it appears that the contract or business is such as is usual and incidental to the very purpose of its creation, *but it can do no other*.

Hence all foreign insurance, express, bank and other corporations may, by this comity, make and enforce in this State all such contracts as are entered into in the ordinary and regular business for which they were created, and no other. But the

power in one railroad company to lease and operate other railroads is not a usual or necessary power, and therefore the comity of States does not apply, but an express grant of power from this State must be shown before such corporation can lease and operate a railroad here. If the Legislature of Connecticut should pass an act authorizing the Hartford Insurance Company to lease a railroad of North Carolina, this Court could not hold a lease, made under such a power, to be valid by the comity of States. Why? Because that would be not a natural, but an exotic power, as it were, interpolated in the charter, and the duty of self-protection and respect would absolve the State from the obligations of comity.

Long after the defendant road was incorporated and built, the legislature of Virginia passed an act authorizing that Company to lease other roads. The power thus given was no part of the essential or usual attributes of that or any other railroad corporation, and tho' valid in the jurisdiction of Virginia, it cannot be enforced here. Comity in such case is out of the question. Express legislation is necessary. Such I understand to be the doctrine long established in the leading case of the *Bank of Augusta* v. *Earle*, 13 Pet. 283. There the bank had been incorporated and existed in Georgia, and through an agent had made a loan in Alabama, upon which an action had been brought in the latter State. The defendant denied the power of the bank to make and enforce contracts in Alabama. The Court held the contract to be valid and enforcible in the Courts of Alabama, but upon the ground that the bank, in making the contract sued on, was pursuing the usual and legimate business of banking, the purpose for which it was created, and that in such cases, by the comity of States the contract was valid and would be enforced in Alabama, it not appearing to be against her laws of public policy.

But it is against the policy of nations to allow one company to transfer its powers to another corporation, even in the same State, and it has been so expressly decided in the English Courts. 9 Hare, 306 ; 12 Eng. L. & E., 244. And so again,

the very point before us, has been decided by the highest authority, 19 Eng. L. & E., 513, in which it is held, that where one railway leased its entire use to another company, the lease was illegal as against public policy, unless it had been expressly authorized by act of the legislature. Much more does public policy forbid such a lease to a foreign corporation.

Public law so well settled and recognized at home and abroad, should not be overthrown by the mere *construction* of words in a charter, of ambiguous and doubtful meaning; but on the contrary, should control their construction, according to every rule of interpretation. It would be monstrous if the courtesy of this State, or any thing short of express and positive legislation, could be successfully invoked to validate the purchase of our railroads by any foreign adventurer who chooses to go into the market, and who may inaugurate a management and policy utterly subversive of the interests and institutions of the State, and the very purposes for which these corporations were created. For it is certain that if this road and franchise can be transferred to the defendant without express legislation, it and all other roads of the State with like charters, can be transferred to Turkey or Egypt as well, and their interests and policy control them, however unfriendly to our own.

The rapid multiplication of these bodies, their resources and far reaching ambition, their ubiquity and vast combinations, all moved and directed by concentrated power and talent, constitute them a distinct, and almost independent and overshadowing power in our governments, and in fact the great social and political problem of the age. Whether they shall control governments or governments shall control them, are questions that are forcing themselves upon public attention, and fast assuming practical importance. They should and will be maintained in the exercise of all their essential and legitimate powers, as necessary and useful institutions of modern civilization. But if in addition to the dangerous power of transferring all their property and franchises, to any body and anywhere, it should also be held, that their corporate powers are such con-

tracts as put them beyond the reach of all legislative check or control in the interest of society, then the problem will have been solved.   The government, in my opinion, will have abdicated its sovereignty, heretofore supposed to be inalienable, and society will be left without protection to chartered irresponsibility.

Whether the power of legislation has not been expressly reserved to the State in sections 50 and 52 of the North Carolina road is a question not now before us for discussion.

My conclusion upon the whole case is, that the North Carolina Railroad Company had no right to change the gauge and its assignee acquired no right to change it; and further that the lease is *ultra vires* and void.   For although the right of transportation over the road is the subject of lease, the lease as made cannot be good in part and bad in part, because it is impossible to separate the good from the bad and to apportion a rent given *in solido*.   I therefore think the judgment of the Court below should have been affirmed.

PER CURIAM.                        Injunction dissolved.