HILL v. RAILROAD.

(Filed December 22, 1906).

*Corporations—Stockholders—Meetings—Notice—Irregularities—Resolutions—Ratification—Waiver—Laches—Presumptions — Railroads — Leases — Time — Covenants—Breach—Forfeiture—Stare Decisis—Ultra Vires Acts.*

1. It is essential to the validity of the acts of the stockholders of a corporation that they should be assembled in their representative capacity, as they are not permitted to discharge any of their duties unless thus organized into a deliberative meeting, though they may all have severally and individually given their consent to any proposed corporate action.

2. Notice to each of the members of a corporation of the time and place of holding a meeting of the stockholders is absolutely essential to its validity, unless the stockholders are present in person or by proxy, or unless the time and place are definitely fixed by the statute or by the charter or by usage.

3. Where a railroad company resolved to lease its road at a special meeting of the stockholders, of which one of the stockholders had no notice, but at a subsequent annual or stated meeting a resolution was introduced, at his instance, instructing the proper officers to take legal action to set aside the lease and recover the property, and such resolution was defeated: *Held*, that this was a ratification of the lease so far as any irregularity in calling or the manner of holding or conducting the former meeting is concerned.

4. In the absence of proof to the contrary, it will be assumed that an annual or stated meeting of the stockholders of a corporation was held in accordance with the requirements of the charter.

5. Where, after a lease of the property of a railroad company had been authorized at a special meeting, of which the plaintiff had no notice, a regular annual meeting was duly held, of which the plaintiff had due notice and at which the president reported the material facts relating to the lease, and his report was received and adopted, this was a distinct approval of the lease by the clearest implication and without objection.

6. Where a stockholder of a corporation, with knowledge of the execution of the lease of all its property, maintained silence and inaction for more than a year, during which time the lessee had expended large sums of money in execution of his part of the contract and extensive dealings in the stock have taken place, this was a waiver of any right which he originally had to object to irregularities in the execution of the lease.

7. Where a resolution authorizing the lease of corporate property required the deposit of the sum of $100,000, *or* United States bonds, or bonds of the State of North Carolina, or other marketable securities acceptable to the directors and having a market value of not less than said sum, as security for the payment of the rentals, etc., while the léase itself provides that there shall be a deposit of $100,000 *in* United States bonds, or bonds of the State of North Carolina, or other marketable securities, etc.: *Held*, that the provision as contained in the resolution means that the lessee shall deposit either $100,000 in money, bonds or other marketable securities having a current value of not less than that sum, and not that the deposit should consist of bonds or securities having a par value of $100,000, and the substitution of the word "in" for the word "or," which was in the resolution, was merely accidental.

8. Where a resolution for the lease of corporate property provided for the deposit of securities for the payment of rentals with the State Treasurer, but the deposit was made with a trust company as authorized by the terms of the lease, and the change was called to the attention of the stockholders by the president at an annual meeting held a few months after a resolution had been passed directing a full inquiry to be made by a committee into the matter of the deposit, and particularly as to when and where it had been made, after which no further objection was made as to the deposit: *Held*, that the stockholders are presumed to have had knowledge of the contents of the lease, and any objection to the lease because the deposit was not made with the State Treasurer, or because it was not sufficient in amount, was waived.

HILL *v.* RAILROAD.

9. Where a lease of railroad property provided that the "lessee doth covenant with the lessor that it will not within any time during the continuance of said term fix or establish a rate on local freight at a higher average rate than the average tariff rate for local freight as established by the lessor at the time of the execution of the lease," but no clause of forfeiture was annexed: *Held*, that the failure to comply with the covenant does not work a forfeiture of the lease, but simply gives to the lessor a cause of action on the covenant for its breach.

10. Where the term of a lease of property of a railroad company extends beyond the time fixed by its charter for the corporate existence of the lessor, such a lease is valid for the period of the corporate life of the lessor, and will extend beyond that period if the charter is renewed, and the lessor's corporate existence is thereby extended, and by this process it may endure for the full term.

11. The charter of the defendant company conferring the right to transport passengers and freight, and giving the power to "farm out" the right of transportation, authorizes the company, by the former decisions of this Court, to execute a valid lease of its property and franchises to another railroad company.

12. The doctrine of *stare decisis* is applicable to this case and means that this Court should adhere to decided cases and settled principles, and not disturb matters which have been established by judicial determination.

13. A former adjudication of this Court in construing a statute or the organic law should stand when it has been recognized for years; and in such a case the principle settled or the meaning given to the statute becomes a rule for guidance in making contracts, and also a rule of property, and it should not be disturbed even though the conclusion reached may not be satisfactory to the Court at the time the same matter is again presented.

14. After a statute has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the text itself.

15. Where an alleged illegal transaction has been fully consummated and large expenditures have been made, the benefit of which have been received by the corporation and an objecting stockholder, and the rights of third parties have intervened, so that the *status quo* cannot be restored, and the cancellation of the contract upon the ground of its being *ultra vires* would defeat justice or work a legal wrong, a court of equity will interfere, if at all, only at the instance of the State.

CLARK, C. J., dissenting.

ACTION by W. F. Hill and others against the Atlantic and North Carolina Railroad Company and another, heard by *Judge B. F. Long,* at the February Term, 1906, of the Superior Court of CRAVEN.

This suit was brought by the plaintiffs to annul the lease of the Atlantic and North Carolina Railroad Company to the Howland Improvement Company, now the Atlantic and North Carolina Company, one of the defendants. The action was commenced in the name of W. F. Hill in behalf of himself and all other stockholders of the Atlantic and North Carolina Railroad Company. C. E. Foy and the Board of Commissioners of Craven County afterwards came in and by leave of the Court were associated with W. F. Hill as plaintiffs. The lease was attacked upon the following grounds:

*First.* The meeting of the stockholders called by the then president of the company, and at which the resolution was passed which authorized the execution of the lease, was irregularly called, due notice of the meeting not having been given as required by the charter and the meeting not having been held at the place designated in the call. The facts relating to this objection are as follows: The by-laws of the company provide that the president shall have the power to call occasional meetings of the stockholders at such time and place as he may think proper, first giving twenty days' notice thereof in two or more newspapers published in New Bern. The president issued a call for an occasional or special meeting of stockholders to be held in New Bern on the first day of September, 1904, for the purpose of considering a proposition to lease the property and so forth of the company. The notice of or call for said meeting was published in but one newspaper, the *New Bern Journal,* it being at that time the only one published in said city. No personal notice of the meeting was ever given to any of the plaintiffs. Some of

the stockholders assembled in New Bern at the time appointed in the notice and organized by electing a chairman and secretary. A report was made by the proxy committee through its chairman, Henry R. Bryan, and the meeting was then adjourned to reassemble at Morehead City the same day at 3 o'clock P. M. The stockholders accordingly reassembled at Morehead City and passed the resolution directing the lease to be executed. The plaintiff W. F. Hill was not represented at said meeting, either in person or by proxy. He was at the time the owner of one share of the stock of the company. The Board of Commissioners of Craven was represented and voted the stock owned by the county in favor of the resolution authorizing the lease to be made. C. E. Foy was present and formally protested against making the lease, and his protest was entered on the minutes. The lease was not read to the stockholders. The by-laws further provided that "No contract for the assignment, sale or transfer of any corporate right, franchise or privilege of the company shall be made till the question of sale or transfer shall have been submitted to a vote of the stockholders and such sale or transfer approved by a majority of private stockholders in the State." At the regular annual meeting of the stockholders of the Atlantic and North Carolina Railroad Company held on 20 September, 1905, a resolution was introduced at the instance of W. F. Hill, one of the plaintiffs, instructing the president and directors of the lessor company to institute an action against the Atlantic and North Carolina Company, the lessee company, to cancel the lease made originally to the Howland Improvement Company and to recover possession of all the property, rights and franchises therein described. This resolution, on motion, was laid upon the table. The same resolution was introduced at a regular meeting of the directors on 28 September, 1905, at the request of W. F. Hill, and was also laid upon the table. There was a regular annual

meeting of the stockholders of the lessor company on 22
September, 1904, which was held as provided by the com-
pany's charter, and of which all the plaintiffs had due notice.
The plaintiffs, other than W. F. Hill, were represented at the
meeting and participated in the proceedings. No steps were
taken by any one to set aside the lease, which had then been
made, nor was its validity questioned in any way. The pres-
ident of the company, James A. Bryan, submitted his annual
report and in it referred to the fact that the stockholders of
the company, by a very large majority vote, had authorized a
lease of its property and franchise to the Howland Improve-
ment Company, "of which R. S. Howland is the progressive
and enterprising president," and that an inventory of the
property so leased was then being taken, and that Charles
Dewey had been appointed to act with the expert of the lessee
company to examine and report upon the condition and value
of the road-bed, warehouses and other property of the lessor
company, their report to form the basis of the agreement for
the actual transfer of the property from the lessor to the
lessee. The president then proceeds to say: "In leasing your
property to the Howland Improvement Company, while there
was, and was to be expected, some opposition to it, the im-
pression is becoming general that your act was a wise one,
and will result in the near future in the developing and up-
building of the entire section along its line, a condition much
needed and long hoped for, but until now having little pros-
pect of realization." The provisions of the lease relating to
the rental are then set forth, giving the increasing amounts
for the successive periods during the entire term. No objec-
tion was made to the report, but, on the contrary, it was
received and approved by the stockholders and ordered to be
recorded in the minutes. The lease provides as follows:
"The said lessor for itself, its successors and assigns, does
covenant and agree to and with the lessee, its successors and

assigns, that the said lessor and its stockholders and directors will not do anything or take any action as such stockholders and directors that may or can interfere, in any way whatsoever, with the free use and operation and convenience of said railroad and other property so hired, let, farmed out and delivered to the said lessee according to the terms and intent of these presents."

*Second.* The lessee has not made the deposit of bonds required to be made before the lease should become effective, and, therefore, nothing has passed to the lessee. The resolution adopted at the meeting of 1 September, 1904, empowered the officers and directors to cause the lease to be executed and to look after the details of the transaction. The directors afterwards formally ratified and approved the lease as submitted at the said meeting of the stockholders and by resolution directed the property, rights and franchises of the lessor company to be turned over to the Howland Improvement Company upon the latter making the deposit required by the lease and complying with the conditions precedent mentioned in the lease. The provision of the lease in regard to the deposit is as follows: "To secure the prompt and faithful payment of said rents and sums as above stipulated to be paid, and of all taxes payable on the demised railroad and property as herein provided, and the faithful performance of the covenants entered into herein by the lessee as herein set forth, the lessee does covenant to and with the lessor, its successors and assigns, that it will deposit and keep on deposit with the Treasurer of the State of North Carolina, or any such bank or banks or other depository as may be approved by the directors of the lessor from year to year, and all the time during the continuance of said lease, the sum of one hundred thousand dollars in United States bonds, or bonds of the State of North Carolina, or other marketable securities acceptable to the directors of the lessor, and having a market value of not

143—35

less than said sum." At the meeting of 1 September, 1904, "the matter of permitting the Governor of the State to look after the making of the deposit required of the lessee was informally discussed" and on 3 September, 1904, the Governor deposited a certified check for $100,000 (which was furnished by R. S. Howland for the lessee) in the Bank of Wayne, and received a certificate of deposit therefor from said bank in his own name as Governor of the State. On 6 September, 1904, the president of the Atlantic and North Carolina Railroad Company and the presidents respectively of the Howland Improvement Company and the Wachovia Loan and Trust Company agreed that eighty of the North Carolina construction 6 per cent. coupon bonds, each of the denomination of $1,000, be deposited with the said Loan and Trust Company for the purposes set forth in the lease. The eighty bonds were purchased with money furnished by R. S. Howland, a part of which was the deposit in the Bank of Wayne, the certificate of deposit which was transferred to the seller being considered as so much cash paid on the purchase-money. The bonds were deposited with the Loan and Trust Company on 13 September, 1904, and were accepted by the latter upon the trust just stated, and are still held by said company. At the time of the deposit and at the time of the trial of this case the said bonds were worth $105,600. At a meeting of the directors of the lessor company held 11 July, 1905, an inquiry was directed to be made by the president, under the advice of the general counsel, into the matter of the deposit required by the lease, it being $100,000. At a meeting of the stockholders of the lessor company held 28 September, 1905, the president, J. W. Grainger, read his report, which was adopted. In it the following statement was made in regard to the deposit: "For the faithful payment of all rents, taxes and other obligations assumed by the Howland Improvement Company, lessees of your road,

they are under contract in the lease to deposit a sum amounting to one hundred thousand dollars in United States bonds, or bonds of the State of North Carolina, or other securities acceptable to the directors of your company. This deposit has been made by the lessee in 6 per cent. coupon bonds of the State of North Carolina, maturing 1 April, 1919, placed in the Wachovia Loan and Trust Company of Winston-Salem, N. C."

*Third.* That the lessee has violated the contract on its part by increasing freight charges beyond what they were when the lease was executed. The lease contains the following clause: "The lessee doth covenant to and with the lessor, its successors and assigns, 'that it will not at any time during the continuance of said term fix or establish rates on freight, called local freight, at a higher average price or rate from station to station than the average rate for local freight tariff as lawfully fixed and established by the lessor at the time of the execution of this lease." The lessee did increase the local tariff rates over what they were at the time the lease was made on divers articles mentioned in the case, such as green lumber, cotton, flour and coal, but on dried lumber and certain other articles named they have been decreased.

*Fourth.* That the lessor company has no power to make the lease, and it is therefore void as being *ultra vires.* The facts which relate to this contention, and which appear in the case, may be thus stated: It is provided by the lessor's charter, sec. 17: "That the said company shall have the exclusive right of conveying or transporting persons, goods, merchandise and produce over the said railroad to be by them constructed, at such charges as may be fixed by a majority of the directors." Sec. 18: "Be it further enacted, that the said company may, when they see proper, farm out the right of transportation over said railroad, subject to the rules above mentioned, and the said company and every person who may

have received from them the right of transportation of goods, wares and produce on said railroad, shall be deemed a common carrier as respects all goods, wares and merchandise entrusted to them for transportation." The company was incorporated on 27 December, 1852, for the term of ninety-nine years. The contract of lease is dated 1 September, 1904, and it is provided therein that the lease shall commence on that day and continue thereafter for the full term of ninety-one years and four months. It demises the franchise and all the rights, privileges and property of the lessor, and the formal transfer of the same took place on 3 September, 1904. The capital stock of the lessee company is limited to one million dollars, to be divided into ten thousand shares of the par value of $100 each, and 1,765 shares of the par value of $176,500 had been issued when the lease was made. Since the execution of the lease, and prior to the commencement of this action, 1,323 shares of the capital stock of the lessor company have been transferred on its stock book to new parties, and said transfers were based upon sales for value. Mr. Roberts, Mr. Joseph G. Brown, and Mr. Duncan testified that the stock of the lessor company had sold before the lease was made at from 20 to 30 cents on the dollar, while since, it had sold as high as from 60 to 70; while Mr. C. E. Foy testified that before the date of the lease the stock had sold at 47 to 50 and after that date it had sold as low as 50; that he bought some in May, 1904, at 50, and that after that date it had sold as low as 50, and he had bought some at that price. Dr. Hughes testified that he had owned some of the stock for two years before the date of the lease, and had offered to sell it at from 25 to 30, but had not sold it until two or three months before said date, when it brought 47. Mr. C. E. Foy stated that some of the stock sold just before or just after the McBee receivership at prices ranging from 47 to 53½ cents on the dollar. The statements of all these

witnesses were found to be correct, and are to be taken and considered as facts in the case. It also appears that dividends have been declared by the lessor company and paid out of funds received from the lessee under the lease, the payment in 1906 having been made directly by the lessee company, and that all the plaintiffs and the other stockholders, except the plaintiff W. F. Hill, received the dividends for the years 1905 and 1906 paid to them respectively without any objection on account of the fact that they had been paid out of the rent or other funds received under the lease. The plaintiff Hill kept his dividend-check for six weeks without objection. The lessee from 1 September, 1904, to the date of bringing this suit, has expended for betterments on the road and equipment between $100,000 and $200,000.

The plaintiff C. E. Foy testified that he suggested the bringing of this suit to the plaintiff Hill, and agreed to save him harmless.

We have not set forth in detail the terms of the lease, as we do not consider it necessary to do so. It may properly be stated, though, that among other things not deemed material, it provides for the expenditure of $250,000 by the lessee within three years from the date of the lease for the permanent betterment of the road-bed, the equipment of the road and the improvement of terminal facilities; for the insurance of the property and its preservation in good condition; for the indemnification of the lessor against any loss or damage by reason of a violation by the lessee of any of its duties or obligations or by reason of any tort committed by it for which the lessor in law could be held liable to the injured party; for the continued corporate existence of the lessor company; the expenses of maintaining it and of providing a proper inspection of the company's property from time to time to be paid by the lessee, the amount, though, not to exceed the sum of $1,200. It is further provided that if the corporate

life of the lessor is ended by the expiration of the term fixed
by its charter, before the term of the lease will expire, the
lease shall in that case come to an end when the charter
expires by its own limitation, but if it is prolonged, then the
lease shall continue so long as the charter does, but not
beyond the time fixed in the lease.'

At the trial below it was agreed by the parties that a jury
should be waived and the Judge should find the facts and
state his conclusions of law thereon, and render judgment
accordingly.

We have made the foregoing statement of what we regard
as the material facts from the findings as they appear in the
record. The Judge concluded, as to the objection founded
upon irregularities in calling and holding the corporate meet-
ings, that all the parties concerned had acted in good faith
and that those defects, if they are such, had been either
waived or the lease ratified, so far as they are concerned, by
the subsequent proceedings and transactions. As to the de-
posit of the bonds, he ruled that there had been a substantial
compliance with the stipulation in the lease and that the
default, in this respect, if there had been any, had also been
waived. The objection that there had been an increase in
the charges for freight was not regarded by him as a cause
for forfeiture, but rather, if well grounded, as entitling the
lessor to an action on the covenant. The last reason urged by
the plaintiffs, namely, that the lease is *ultra vires,* was re-
jected by him, as the question which it raises had been settled
by former adjudications of this Court which, under the doc-
trine of *stare decisis,* should not be disturbed.

The Court thereupon adjudged that the defendants go
hence without day and recover of the plaintiffs their costs to
be taxed, and the plaintiffs appealed after having duly ex-
cepted to the several rulings of the Court and to its final
judgment.

*W. W. Clark, O. H. Guion,* and *L. I. Moore* for the plaintiffs.

*A. D. Ward, Aycock & Daniels, R. D. Gilmer, P. M. Pearsall* for the defendant.

*Busbee & Busbee* for private stockholders.

WALKER, J., after stating the facts: The plaintiffs seek in this action to set aside the lease made by the Atlantic and North Carolina Railroad Company to the Howland Improvement Company, which has been succeeded by the Atlantic and North Carolina Company, which latter company is now fully vested with all of its rights and interests under the said lease. It is asserted that the lease is void upon several grounds: 1. Because the meeting of the railroad company, at which authority was given to execute the lease, was not called according to the provisions of its charter, in that the requisite notice of the time and place of holding the meeting was not given and that the meeting was not held at the place designated in the call. 2. That the lease has never taken effect, as the deposit of bonds provided for in the resolution of the stockholders of the railroad company has never been made, this being a condition precedent, the performance of which was required by the express terms of the resolution before there could be any valid execution of the lease. 3. The lessee has violated its contract by increasing the local charges for the transportation of freight above the tariff rates existing at the time the lease, if valid, was executed. 4. That the railroad company had no authority, under its charter or the general law, to lease its franchise and other property, and the proceedings by which it attempted to do so were *ultra vires,* and the lease is, therefore, null and void.

It is unquestionably true that no function of a corporation can legally be exercised except by and through its agents and representatives, either its directors when they are clothed with power for that purpose, or the stockholders who are the

constituent members of the corporate body. It is, therefore, essential to the validity of their acts that they should be assembled in their representative capacity, as they are not permitted to discharge any of their duties unless thus organized into a deliberative meeting, though they may all have severally and individually given their assent to any proposed corporate action. *Duke v. Markham,* 105 N. C., 131. This rule of law is in accordance with a plain dictate of reason and justice. The corporation is entitled to the opinion and judgment of each of its members or of each of its directors or of its other governing body, upon any and all measures taken in the transaction of its business affairs, and for the same reason is each stockholder, whose interests may be vitally affected, entitled to be present and to a reasonable hearing, and especially where anything is to be done likely to prejudice or impair his rights. This principle of the common law, expressed in one of its favorite maxims, is applicable not only to judicial tribunals which pass in judgment upon individual rights, but to corporate bodies as well. Therefore has it always been conceded, as a just and indisputable rule in the law of corporations, that notice to each of the members of a corporation of the time and place of holding a meeting of the stockholders is absolutely essential to its validity, unless the stockholders are present in person or by proxy or unless the time and place are definitely fixed by statute or by the charter or, as it is said, by usage. Clark on Corporations, p. 464 (184); Morawetz on Priv. Corp. (2 Ed.), sec. 479. The majority can act for the corporation, of which they constitute a part, only at a meeting which has been regularly called, and the law permitting a majority thus to act and decide for the corporation against the will of the minority, when there is no restriction in the charter or the general law, presupposes that there has been discussion and deliberation in which all had the right and the opportunity to participate. Failure, therefore,

to notify even one of the members, either personally or in the manner provided by the charter, is fatal to the proceedings and transactions of the meeting. *Ibid.*

We will assume, for the purpose of deciding this case, that the publication of notice in one newspaper, there being only one then published in New Bern, was insufficient as a legal notice under the charter, and that Hill had no notice of the meeting; and if this is so, and it were all that appeared in this case, we should be compelled to hold that the meeting was not regularly held and its action in regard to the lease was void as to the protesting stockholder who was absent. But this is not all. No stockholder, who was not present, has complained of what was done at the meeting in New Bern and the adjourned meeting at Morehead, but the plaintiff Hill. Foy was there and the Board of Commissioners of Craven County was duly represented. The meeting at which it was resolved to make the lease was held on 1 September, 1904, first at New Bern, and then by adjournment at Morehead City in the afternoon of the same day. Hill was not present either in person or by representation. His co-plaintiffs were, and the stock-vote of the Commissioners of Craven County was cast in favor of the lease. It is true that Foy protested against making the lease and threatened to institute legal proceedings to annul it, but he was there and participated in the meeting, and this fact dispensed with notice to him. He and the Commissioners are therefore not in a position to complain of a want of notice. Thompson on Corp., secs. 712 and 6184; Clark Corp., p. 464.

How is it with Hill? So far we have assumed that he was not bound by the proceedings; but a subsequent annual or stated meeting of the corporation was held on 20 September, 1905. In the meantime no action had been taken by Foy in execution of his threat to sue, or to make good his protest against the action of the stockholders, although more than a

year had elapsed since the lease had been executed. At the meeting of 20 September, 1905, a resolution was introduced by Foy, at the instance of Hill (as the finding of the Judge and the evidence show), instructing the proper officers to take such legal action as was necessary to set aside the lease and recover the company's franchise and other property from the lessee, and identically the same resolution was introduced, in the same way, at the meeting of the directors, after the adjournment of the stockholders' meeting on the same day. Both resolutions were, on motion, laid upon the table, or, in other words, defeated.

The defendants contend that this was a waiver of any irregularity in calling the meeting of 1 September, 1904, or a ratification of what then was done in regard to the lease, so that any defect in the proceedings was cured and the lease fully validated in respect to the objection that there was no notice of the first meeting, or that it was adjourned from New Bern to Morehead, if that was irregular; and so we think. *Wells v. Gates,* 18 Barbour, 558; *Hotel Co. v. Marsh,* 63 N. H., 230; *Stokes v. Detrick,* 75 Md., 256.

The plaintiff's counsel seems, in his brief, to concede that this would be true, provided it appeared affirmatively that at the annual meeting the requisite majority had voted to table the resolution.

It cannot well be argued that the refusal of the stockholders at that meeting to adopt the resolution of Hill, introduced by Foy, was not a distinct approval and affirmance by them of the action taken at the first meeting. *Zabriskie v. Railroad,* 64 U. S. (23 How.), 381. It is hardly necessary to discuss, or to cite cases for the purpose of sustaining, so plain a proposition; but how stands the law with reference to the question presented by the contention of counsel? An examination of the authorities discloses that there is little or no disagreement as to the presumption of regularity with respect

to an annual or stated meeting. It is settled that in the absence of proof to the contrary, it will be assumed that such a meeting was held in accordance with the requirements of the charter. "If a stockholders' meeting," says Mr. Clark, "is irregularly called or conducted, the irregularity may generally be waived by the stockholders. They may ratify acts of the majority which are not binding because of irregularities, and thereby render them binding. Every reasonable intendment is to be made in favor of the regularity of stockholders' meetings, and the burden is upon one who claims that they were invalid to show the circumstances rendering them so. In the absence of evidence to the contrary, their legality will be presumed. 'The maxim of law in such cases is, *Omnia rite acta presumuntur.*' Thus it has been held that, in the absence of evidence to the contrary, it will be presumed that due notice was given to all stockholders. So it will be presumed that a quorum of members was present, unless the contrary clearly appears." Clark on Corp., p. 471. This presumption is indulged as to an annual meeting held under the provisions of the charter. With reference even to the case of a special meeting, where notice was required to be given, the very question we now have under consideration was presented in the case of *Insurance Co. v. Sortwell,* 90 Mass. (8 Allen), 223, in which the Court says: "The other objection to the legality of the meeting is, that a quorum of members of the company, according to the requisition of the by-laws, was not present at the time the act was accepted. It is true that the record does not show affirmatively that fifteen members of the company were present at the meeting. Nor is it necessary that it should. The contrary does not appear. It is sufficient that the record shows that the meeting was duly called, and proper notice of it seasonably given. The law will assume, in the absence of evidence, that a proper number were present to transact the business for which the

meeting was called. Illegality will not be presumed, but the contrary. The maxim of law in such cases is, '*Omnia rite acta presumuntur.*' *Sargent v. Webster,* 13 Met., 504." See also Thompson on Corporations, sec. 3926, *et seq.*

The charter appoints the time for holding the general meetings (fourth Thursday in September), and, as we understand, there is no point made because of any omission to give notice of the annual meeting held 28 September, 1905. But even in regard to that and to all other matters, the law presumes regularity and the performance of all conditions essential to the validity of the proceedings, in the absence of any showing that there was a failure in some material respect to observe the directions of the charter. The unequivocal act of tabling the resolution of the plaintiff Hill, we must hold to be a clear ratification of the lease binding upon the company and all of its stockholders, so far as any irregularity in the calling or manner of holding or conducting the former meeting is concerned. We have not yet referred to the fact that "a regular annual meeting was duly held as provided by the charter on 22 September, 1904, of which the plaintiffs had due notice" (Finding No. 28), and at which Mr. Bryan, the president of the company, reported the material facts relating to the lease. His report was received by the meeting, and adopted. (Finding No. 38). This was a distinct and emphatic approval of the lease by the clearest implication, and without any·objection from a single stockholder. Thompson on Corporations, sec. 3928; *Zabriskie v. Railroad, supra.*

But we also think that the silence and inaction of the plaintiff Hill from 1 September, 1904, to 28 September, 1905, was a waiver of any right he originally had to object to irregularities of which he now complains. He has forfeited by his conduct any right he had in the beginning.

It is a general rule of law, as well as of good morals and fair dealing, that if a party is silent when he should speak or supine when he should act, he will not afterwards be permitted to either speak when he should be silent or to act when he has failed to do so at the first proper and opportune moment. The acquiescence of one who might have taken advantage of an error obviates its effect, *"Consensus tollit errorem."* Upon this maxim of the law depends the important doctrine of waiver, that is, the passing by of a thing. "Silence always implies consent," says another cardinal maxim of the law. *"Qui tacet consentire videtur."* "Where, however," as we are told by Mr. Broom, "an irregularity has been committed, and where the opposite·party knows of the irregularity, it is a fixed rule, observed as well by courts of equity as of common law, that he should come in the first instance to avail himself of it, and not allow the other party to proceed to incur expense. 'It is not reasonable afterwards to allow the party to complain of that irregularity of which if he had availed himself in the first instance all that expense would have been rendered unnecessary;' and, therefore, if a party, after any such irregularity has taken place, consents (expressly or impliedly) to a proceeding which, by insisting on the irregularity, he might have prevented, he waives all exceptions to the irregularity. This is a doctrine long established and well known." Broom's Legal Maxims (8 Ed.), p. 137. What he clearly means is that a party must not only threaten or declare his purpose to do a certain thing if his objection is ignored, but he must follow up his protest by appropriate action; otherwise, he will be deemed to have abandoned his original intention and to have condoned the imputed wrong. This rule, though applied usually to matters of pleading and procedure, is yet equally applicable to all cases where the question of laches is involved, and is generally favored in a court of equity. The doctrine is well stated in Thompson on Corporations, sec.

4534, where it is substantially said that while a court of
equity will interpose at the suit of a single stockholder to
enjoin acts done by the officers of a corporation irregularly
or in excess of their powers, which are injurious to his rights,
or acts *ullra vires* (Thompson on Corp., sec. 4520), yet if he
has stood by until the transaction to which he objects has
become executed, he will not afterwards be heard to com-
plain; and this is so although the party who may have dealt
with the corporation in the particular case knew of the irregu-
larity of the proceedings or the invalidity of the transaction.
When the act is done in good faith for the benefit of the com-
pany, although not done as it should have been, the stock-
holder must dissent within a reasonable time or his assent
will be presumed and he will be estopped from gainsaying
the validity of the transaction by his silence, when he ought
to speak and act, it being such a neglect of duty that he is not
entitled to the consideration of a court of justice; and espe-
cially is this principle enforced when the objectionable act may
be followed by a large expenditure of money, in which case
the stockholder should not only enter his protest seasonably,
but follow up the same by active and preventive means, for
it is obviously against good conscience that one who has the
power to prevent the alleged injurious proceeding should
stand by and see work prosecuted and money expended that
may result to his benefit, and afterwards raise his objection
thereto.   He may not thus wait unreasonably and pocket the
gain of the venture if successful, and then, if so minded, fall
back upon his protest as a saving of his legal remedy.  Such
a course of conduct is the full equivalent of bad faith, and
the doors of the Court are shut against him because he cannot
enter it, as he should, with clean hands and a clear conscience.
His neglect to act, and not merely to speak, at the proper time,
bars his right to remedial justice as effectually as his neglect
to protest would have done.  *Watts' Appeal,* 78 Pa. St., 370.

"The stockholder of a corporation who seeks to prevent the consummation of an illegal corporate act, or to avoid it, should be *swift* to make known his desires and assert his rights through the tribunals appointed for that purpose." *Thompson v. Lambert,* 44 Iowa, 247. It is his duty to act, and with reasonable promptness. *Zabriskie v. Railroad, supra.* If he has refrained from this obvious course of action until the matter is fully consummated or, as in this case, until the lease transaction has proceeded to completion, instead of invoking the restraining power of the Court at the proper time, it would be exceedingly unjust to listen to his appeal when he has thus come too late and after costly improvements have been made, large sums expended in execution by the lessee of its part of the contract and extensive dealings in the stock of the company have taken place—all, perhaps, in reliance upon his long-continued silence and inaction as evidence of his acquiescence in the existing situation and upon the reasonable supposition that his threat to sue was merely an idle one or that upon mature consideration he had changed his mind. *Clegg v. Edmondson,* 8 De Gex M. & G., 787; *Ashurst's Appeal,* 60 Pa. St., 290; *Railway v. Railway,* 3 De Gex M. & G., 341; *B. C. Co. v. Lloyd,* 18 Ves., 514; *Rogers v. Cruger,* 7 Johnson, 611; *Bradley v. Ballard,* 55 Ill., 413; *Wood v. C. W. Co.,* 44 Fed. Rep., 146; *Stokes v. Detrick, supra; Lyceum v. Ellis,* 8 N. Y. Supp., 866. The doctrine, therefore, is so firmly established as to be placed beyond the reach of cavil; and it is a very clear and salutary rule in the law of agency adopted for our guidance, that when the principal, with the knowledge of all the facts, acquiesces expressly or impliedly by his silence in the voidable acts of his agent, done under an assumed authority or in disregard of prescribed methods, he cannot be heard afterwards to impeach them, under the pretense that they were done without authority, or even contrary to instructions. *Bank v. Reed,*

1 W. & S., 101. This is tantamount either to a waiver or ratification, and is based upon the idea of laches.

The maxim of the law, that every ratification relates back and is equivalent to a prior command *(Omnis ratihabitio retrotrahitur et mandato priori equiparatur)*, is as much predicable of corporate as it is of individual ratification, that is, of the corporation and stockholder alike, and with the same force and conclusiveness in the case of each of them, and the precedent authority is equally to be presumed as to each in the absence of dissent from the unauthorized act. In either case, if the principal neglects promptly to disavow the act of his agent or his trustee, by which the latter has transcended his authority, he thereby makes the act his own, and will no longer be heard to question its validity. *Kelsey v. Bank*, 69 Pa. St., 426; *F. W. Pub. Co. v. Hitson*, 80 Texas, 216; *Sheldon v. Eickemeyer*, 90 N. Y., 614. An express assent, it is said, is not essential on the part of the stockholder or the corporation in order to operate as an equitable estoppel and defeat the right afterwards to disaffirm or repudiate the alleged irregular act. It may be inferred from the failure, not only to promptly condemn the unauthorized, although not illegal act, but to seek judicial redress for the wrong or a preventive remedy to stay the hands of the offending agent. If this doctrine of equitable estoppel applies to the transaction of corporate or associate bodies as well as to persons acting in a natural capacity—and there never was any doubt that it does—then no case can call more strongly for its application than the one now before us.

The previous conduct and present attitude of the plaintiffs are not calculated to produce a favorable impression upon a Court administering equity. That they have been tardy in coming forward with their grievance and very slow in vindicating their supposed right in the only practical way it could be done, cannot be doubted, and objections now

come from them with bad grace, who have for so long a time slept upon their rights. They must make a better showing of wrongs which they have suffered, and also of reasonable and timely efforts to obtain relief against them, before a court of equity will interfere in their behalf to set aside an executed contract, and especially as it is well-nigh impossible to place the parties in *statu quo*. *Dimpfell v. Railway Co.*, 110 U. S., 210; *M. H. Co. v. Phalen*, 128 Pa. St., 110; *Gordon v. Preston*, 1 Watts, 385; *B. C. Co. v. Lloyd, supra*. The plaintiffs come at this late day for a redress of their alleged grievances and ask for equitable relief to cancel the lease, while they should have appeared and commenced their opposition much sooner, when they could have done so with more show of reason and justice. The laws assist those who are vigilant, and not those who sleep over their rights, is a fundamental rule in equity which is not only eminently just, but is necessary to the protection of those who are more watchful and careful of their interests and who otherwise may be made to suffer innocently if the law should favor one guilty of such laches. We have discussed this branch of the case fully, as our decision upon the first objection urged by the plaintiffs will have an important bearing upon most of the other grounds of opposition to the lease and will make the task of deciding them much less difficult.

Before proceeding further, we cannot do better than direct attention to the steady and unvarying current of judicial thought upon this subject, as indicated in the decisions of some of the courts whose opinions are entitled to the highest respect, and who have had similar questions under consideration. "If he (the complainant) wants protection against the consequences of an *ultra vires* act, he must ask for it with sufficient promptness to enable the Court to do justice to him without doing injustice to others." *Rabe v. Dunlap,* 51 N. J. Eq., 48. "Shareholders cannot lie by, sanctioning,

or by their silence at least acquiescing in, an arrangement which is *ultra vires* of the company to which they belong, watching the result: if it be favorable and profitable to themselves, to abide by it and insist on its validity, but if it prove unfavorable and disastrous, then to institute proceedings to set it aside." *Gregory v. Patchett,* 33 Beav., 595. In *Kent v. Mining Co.,* 78 N. Y., 159, it was said: "Acts of a corporation which are not *per se illegal* or *malum prohibitum,* but which are *ultra vires,* affecting, however, only the interests of the stockholders, may be made good by the assent of the stockholders, so that strangers to them, dealing in good faith with the corporation, will be protected in a reliance on those acts. It is not needed that there be an express assent upon the part of the stockholders to work an equitable estoppel upon them. When they neglect to promptly and actively condemn the unauthorized act, and to seek judicial relief after knowledge of the committal of it, this will be deemed an acquiescence in it; and if innocent third persons have been led thereby to put themselves in a position where harm would come to them if the act were held invalid, the stockholders are estopped from questioning it. An unconscionable arrangement will not be disturbed where there has been a ratification of it, with knowledge of all its bearings, after time has been had for consideration." Mr. Noyes says: "Acquiescence for an extended period during which time the interests of third parties have intervened, may itself constitute laches and prevent a stockholder from attacking a consolidation even on the ground of fraud." Intercorp. Rel., 49. All these authorities and others of equal force and directness were cited and approved by this Court in *Spencer v. Railroad Co.,* 137 N. C., 107, to the carefully prepared opinion by *Mr. Justice Connor* in which case we refer for a clear and conclusive vindication of the principles both by reason and precedent. "It is not to be understood that courts will refuse

to protect the rights of a single stockholder if invaded by the majority, however large, or refuse relief against aggressions of consolidated capital, however powerful," says the Court in that case. But the injured party must move in due time to assert his right, and before the transaction has been fully consummated and the interests of third persons have become involved. We there quoted with approval the following passage from *Pender v. Pittman,* 84 N. C., 372: "This equity ought to be promptly asserted, and not deferred until by a sale other interests may intervene rendering it inequitable, if practicable, to reverse what has been done and restore matters to their former condition. An injunction against carrying out a contract of sale made under a power contained in a mortgage will not be granted when the relief to which the plaintiff considers himself entitled is not sought until the sale has been made and the rights of a purchaser have intervened." We will have occasion again to refer to *Spencer v. Railroad Co.,* when we reach another important and, perhaps, the leading question raised in this case.

The next objection made by the plaintiffs is that the deposit of bonds was not made as required by the resolution of the stockholders, and that this was a condition precedent to the effective execution of the lease, and not having been complied with, the lease is void. Fulfilment of this stipulation is made, by the express terms of the resolution of 1 September, 1904, a condition precedent to its validity, and we will so treat it, so far as the resolution is concerned. In respect to this provision there is some slight difference in the phraseology of the resolution and that of the lease itself. The resolution requires the deposit of the sum of $100,000, *or* United States bonds, or bonds of the State of North Carolina, or other marketable securities acceptable to the directors of the company, and having a market value of not less than said sum, as security for the payment of the rentals, interest and

charges and the performance of the conditions of the lease,"
while the lease itself provides that there shall be a deposit
of $100,000 *in* United States bonds, or bonds of the State
of North Carolina, or other marketable securities, etc. (pur-
suing thereafter the language of the resolution), with this
further provision: "which said deposit and security, or any
equivalent for it which may be substituted therefor, may be
applied" (as in the lease is specified). In the resolution it
is provided that the deposit shall be made and kept with the
Treasurer of the State, and in the lease that it shall be kept
with the Treasurer or in any such bank or banks or other
depository as may be approved by the directors of the lessor
company. The resolution makes this deposit a condition
precedent, while in the lease the provision as to the deposit
takes the form of a covenant, for it says: "And to secure the
prompt and faithful payment of the said rents and the sums
as above stipulated to be paid and of all taxes, and the faith-
ful performance of the covenants made herein by the lessee,
the said lessee does hereby covenant to deposit and keep on
deposit with the State Treasurer," etc. We are clearly of
the opinion that the provision as contained in the resolution
was intended to mean, and its wording so implies, that the
lessee should deposit either $100,000 in money or bonds or
other marketable securities having a current value of not
less than that sum, and not that the deposit should consist of
bonds or other like securities having a par value of $100,000.
The idea was to have $100,000 on deposit to secure the per-
formance of the stipulations of the lease, and that it should,
at all times, be kept equal to that amount, whether it be in
so many dollars or in bonds or other securities of not less
value than that number of dollars. The words, "and having
a market value of not less than that sum," refer to their
immediate antecedents, "the bonds or other securities," and
not to the $100,000 as having the value of that sum, or, in

other words, as being equal to its own value, which would be a solecism. This is the clear import of the language employed in the resolution, and as thus construed there was a substantial compliance with the requirements of the resolution in this respect. We think that the substitution in the lease of the word "in" for the word "or," which is in the resolution, was merely accidental, and that it was not the purpose to change the substance of the provision as found in the resolution. Besides, if the language of the lease is construed by itself, it is evident the same meaning was intended as that we give to the provision in the resolution. The change in the lease from the phraseology of the resolution, and especially the use of the expression, "which said deposit and security or any equivalent for it which may be substituted therefor," it seems to us plainly evinces the intention to have been to require so many dollars to be deposited or securities of an equivalent market value, without any special regard to their par value.

The same reasoning also applies to this ground of complaint as that we applied to the first objection of the plaintiffs to the lease, namely, the want of sufficient notice of the stockholders' meeting. The fact that the deposit had been made with the Wachovia Loan and Trust Company was called to the attention of the stockholders by the president of the company at the annual meeting held on 28 September, 1905. If the change of the depository from the State Treasury to the Loan and Trust Company was not authorized and did not meet with the approval of the stockholders, they were put on inquiry by the report of the change in the depository, and no complaint was made, although that was the time to speak and to raise objections. A resolution was passed at the meeting held on 11 July, 1905, directing a full inquiry to be made by a committee into the matter of the deposit, and particularly as to when and where it had been made, and

this inquiry was required to be conducted under the advice
and guidance of the general counsel of the company. The
stockholders must be held to have had knowledge of every-
thing such an inquiry would have disclosed, and it appears
from the subsequent report of the president that they did
have such knowledge. We could hardly hold that they did
not have knowledge of the contents of the lease (which varied
from the resolution and authorized the change in the deposi-
tory) when it was provided that it should be executed by the
directors; they accepted and approved the form of the lease;
it was so executed, and then an inquiry was ordered to be
made into the matter of the deposit. If they did not have
full knowledge of the contents of the lease, they should have
had it. Much less evidence than we have here has been held
sufficient to fix a party with notice. *Bunting v. Ricks,* 22
N. C., 130; *Blackwood v. Jones,* 57 N. C., 54; *May v.
Hanks,* 62 N. C., 310; *Ijames v. Gailher,* 93 N. C., 358;
*Hulbert v. Douglas,* 94 N. C., 122; *Bryan v. Hodges,* 107
N. C., 492. Those cases decide that the law will presume
knowledge by the stockholders from their laches in not
informing themselves, as they were called upon to do so by
being put on their guard, if they did not in fact have knowl-
edge, which we think it appears they did have, when the
finding of facts by the Court upon this point are properly
considered. But acquiescence to be inferred from long delay,
more than a year, coupled with their silence and the failure
to object at the seasonable moment, as effectually deprives
the plaintiffs of this ground of objection as it did of the other.
In a case strikingly similar to ours in respect to the deposit,
the Court said that the facts showed that the corporation had
notice of the place of deposit under circumstances not as
strong as those in this case, its attention having been called
sharply to the fact by a letter from its treasurer requiring
remittances to be sent during his absence to another than the

appointed depository, and that it acquiesced in the change
of the depository by reporting to the stockholders that its
funds were in the hands of the new depository.   "The con-
duct," says the Court, "of the corporation constituted a rati-
fication of the act of the treasurer (if his act it was) in
selecting the place of deposit, and absolved him from liabil-
ity in that regard." *Railroad v. Dixon,* 114 N. Y., 80.   It
is true the Court finds that at the time of the execution of
the lease no deposit had been made with any one, and that
the change of the depository was not made by the directors,
but by agreement between the president of the lessor com-
pany and the president of the lessee company, though the
matter of permitting the Governor of the State to look after
the making of the deposit was discussed informally at the
meeting of the directors on 1 September, 1904, and he caused
to be purchased the eighty bonds which were subsequently
deposited with the Loan and Trust Company, they being
worth $105,600, and that in changing the place of deposit
the officers, and all others participating, acted in perfect good
faith, nothing to the contrary having been alleged or proved.
If all this was irregular and unwarranted, the Court was
right in deciding, upon the authorities we have already cited,
that it, as well as the other alleged omissions and defects in
the proceedings and transactions, had been fully waived and
the lease in respect to them had been ratified by the subse-
quent conduct of the stockholders, including the plaintiffs.

As to the objection now urged, that there has been an
increase in the local freight charges in violation of the terms
of the lease, it is sufficient to say that the stipulation not to
raise the rates is in the form of a covenant without a clause
of forfeiture annexed to it, as there is in the case of the
deposit.   If the lessee fails to make and keep that good, the
lessor has the right to re-enter and determine the lease; but
not so if the freight charges are increased.   It seems, and

we will hereafter show, that in the latter case the parties did not intend that a failure to comply with the covenant should work a forfeiture of the lease, but simply that it should give to the lessor a cause of action on the covenant for its breach. The law leans against any construction of a stipulation in a contract which will involve a forfeiture, and will construe it to be a covenant rather than a condition subsequent. "As conditions subsequent tend to destroy estates, they are not favored in law, and if it is reasonably doubtful whether a provision in a conveyance was intended as a condition subsequent or a covenant, the breach of which may be compensated in damages, it will be held to be the latter." 1 Cyc., 1050. And this would be so even if the lessor has any other remedy by which to get redress or by which to enforce a compliance with the stipulation. The fact that this provision is in the form of a covenant and that it is not mentioned in the clause of forfeiture and re-entry, would seem to indicate clearly that its violation was not intended by the parties to be good cause for terminating the lease. But the lessor company has not attempted to re-enter for a breach, even if it has the right to do so, which we need not therefore decide.

If the covenant has been broken and there is a continued infraction of it, we do not mean to say that a court of equity could not afford relief by a mandatory injunction or other appropriate equitable remedy and compel strict observance of the stipulation, though in the form of a covenant, if sufficient ground is shown for its interference, and especially if from the peculiar nature of the covenant the breach cannot be compensated in damages recoverable at law, or if the legal remedy would for any other reason be inadequate.

The learned counsel for the plaintiffs contended that the term of the lease would extend beyond the time fixed by its charter for the corporate existence of the lessor company. It has been settled by the authorities that such a lease is cer-

tainly valid for the period of the corporate life of the lessor, and will extend beyond that period if the charter is renewed and the lessor's corporate existence is thereby extended, and by this process it may endure for the full term; and provision is made in this lease to meet just such a contingency. 23 Am. and Eng. Enc. of Law (2 Ed.), 781; Noyes on Intercorporate Rel., sec. 201; 5 Thompson on Corp., sec. 5896; 3 Cook on Corp., p. 2594; Baldwin's Am. Railroad Law, p. 458; *Gere v. Railroad,* 19 Abb. N. C. (N. Y.), 193; *Railway v. Railway,* 51 Fed. Rep., 309 (*s. c.,* 163 U. S., 592); Wood on L. & T., sec. 61, p. 144; *Brown v. Schleier,* 118 Fed. Rep., 981. And this accords perfectly with the reason of the thing and the justice of the case.

We are not now referring to the right or the power of the lessor company to make the lease under its charter or the general law applicable to such cases; but assuming for the present that the power exists, the correctness of which assumption we will consider hereafter, we decide only at this stage of the case that the lease is in all other respects valid.

This brings the discussion to the principal question raised by the plaintiffs, and upon which, we take it, they mainly rely for success, and that is whether this lease is *ultra vires* or beyond the power of the lessor to make. This is an exceedingly important matter, but the difficulty of deciding it is greatly lessened by the former decisions of this Court. If it were an open question, we might be confronted by a very serious problem which would require the gravest consideration; but we do not think that such a situation is presented. The right to discuss the question has been foreclosed by adjudications which we, under established principles, are not at liberty to disregard, if we were inclined to do so. We must consider the former decisions of this Court as authoritative and conclusive upon us.

By referring to the charter of the North Carolina Railroad Company, Acts 1849, ch. 82, we find that by sections 18 and 19 the right to transport passengers and freight and the power to "farm out" the right of transportation were given to that corporation in the same language used in sections 17 and 18 of the charter of the lessor company in this case. The corresponding sections in the two charters are copies of each other. The North Carolina Railroad Company, in September, 1871, leased its road and all its rights and franchises to the Richmond and Danville Railroad Company, a foreign corporation, for thirty years, with the right to change the gauge of the track. An action was brought by the State to test the validity of this lease and to enjoin the change of the gauge, the plaintiff alleging that the lease was executed without any authority of law and that the change of gauge would be injurious to the State and its citizens. This Court, after a careful consideration of the question at issue, decided that the power to "farm out," which was given by the charter, fully authorized the making of the lease and that it was lawful and valid. The Court also decided that under the general law and the charter, the lessor company had the right to change the gauge of its road, which right passed to the lessee by the lease. There was a dissenting opinion, and, too, a very able one, as were all of the opinions of the eminent Judge who wrote it, but this does not affect the authority of the decision as a judicial precedent or take it out of the rule of *stare decisis,* but really emphasizes the fact that the case was well considered. *State v. R. & D. Railroad Co.,* 72 N. C., 634. This is not all. The Legislature by the Act of 1874-5, ch. 159, prohibited any railroad company in the State, except those having a narrow gauge, from increasing the gauge of their tracks, under heavy penalties. The Richmond and Danville Railroad Company, defendant in the former case, and certain of its officers, caused

the gauge off the track of the North Carolina Railroad Company to be widened from four feet eight inches to five feet, and thereupon the said company and its officers were indicted for violating the Act of 1874-5. The Court decided upon the special verdict that the defendants were not guilty, and the decision was placed upon the ground that the North Carolina Railroad Company had leased its franchise, privileges and property to the Richmond and Danville Railroad Company, which included the right or privilege of changing the gauge of the road, and that the lease was valid in every particular, and was not *ultra vires,* as contended by the State through its Attorney-General. *State v. R. & D. Railroad and others,* 73 N. C., 527. It expressly affirmed its former decision in *State v. Railroad, supra,* in the strongest and most emphatic language. It held that the charter of the North Carolina Railroad Company was a contract which could not be violated by the State in the form of legislation or otherwise, and secondly, that the lease between the North Carolina Railroad Company and the Richmond and Danville Railroad Company was inviolable upon well-settled principles of law. Referring to the former decision of the Court involving practically and substantially the same question, the Court, by *Mr. Justice Rodman* (who clearly assented to the view of the Court as stated in the former opinion), said: "It must be assumed in considering this case, that the matters decided in the case of the State against the same company, which is now a defendant, are the settled law of this State, and admit of no question. Two things were decided in that case: 1. That the lease of its road, etc., by the North Carolina Railroad Company to the Richmond and Danville Railroad Company was lawful and valid. 2. That the lessee, by virtue of the lease, had up to the passage of the Act of 1874-5 a right to change the gauge of the North Carolina Railroad." 73 N. C., at p. 529. The Court then ob-

serves that the State owned a large majority of the shares
of stock in the North Carolina Railroad Company, at the
time the lease was made, and had supreme control over every
act and contract of the company, and the lease could not
have been made without its express consent. It also referred
to the fact that the lessor company had covenanted in the
lease not to interfere by its servants or agents with the free
use and convenient operation of the railroad, and for these
additional reasons it could not be heard to question the valid-
ity of the lease or to molest the lessee in the use of the road
or in changing the gauge. These considerations apply with
equal force to this case, as similar provisions to those men-
tioned are to be found in the charter of the Atlantic and
North Carolina Railroad Company and the lease it made to
the Howland Improvement Company. Indeed, the charter
of the Atlantic and North Carolina Railroad Company seems
to be substantially a copy of the charter of the North Caro-
lina Railroad Company, and the lease made by it to the
Howland Improvement Company is, in all particulars perti-
nent to the matters presented in this case, substantially like
that of the North Carolina Railroad Company to the Rich-
mond and Danville Railroad Company. It is utterly im-
possible to escape the conclusion that the question of *ultra
vires,* now raised in behalf of the plaintiffs, has been decis-
ively answered by this Court, against their present conten-
tion, more than thirty-four years ago, in the case of *State v.
Railroad,* 72 N. C., 634, and afterwards upon reconsideration
of the whole matter and review of that decision, it was
solemnly adjudicated by the Court in *State v. Railroad,* 73
N. C., 527, that such a lease purporting to have been made
under a power given in words identical with those used in
the charter of the Atlantic and North Carolina Railroad
Company, was not only authorized by those words and valid
in that respect, but was not *ultra vires.* It is therefore

entirely too late, under the circumstances and in view of those precedents, for the plaintiffs to again raise the question as to the true meaning of the words "to farm out" or to question the validity of the lease upon the ground that it is *ultra vires*. We will not attempt to discuss the question ourselves as if it were *res nova*, for it is not, and every consideration of public policy and good faith requires that we should accept the interpretation given to those words by this Court, and also its decision as to the power of the railroad company to make the lease, as a finality, and we therefore hold that the lease is not *ultra vires,* because it has been so decided and is not open for readjudication.

It is said, though, that we are not bound by those decisions. Why not? The doctrine of *stare decisis,* commonly called the doctrine of precedents, has been firmly established in the law and is applicable to this case, if to any. It means that we should adhere to decided cases and settled principles and not disturb matters which have been established by judicial determination. The precedent thus made should serve as a rule for future guidance in deciding analogous cases, and it should especially be controlling, as we will hereafter see, if, as in this case, persons in their business relations and in making their contracts have acted upon the faith of its correctness and in reliance upon its continuance as a rule of law, so that rights have become vested which will be seriously impaired if the rule thus established is reversed. This is not only a sensible but a just principle, and a contrary rule would manifestly be inequitable. Let us give solemn heed to the impressive language of *Lord Kenyon,* when laying an injunction upon the Judges to abide by former decisions: "I cannot legislate," said he, "but by my industry I can discover what my predecessors have done, and I will tread in their footsteps." These words which fell from the lips of a great Judge cannot be too often carefully

weighed by us, when situated as we now are and as he was
at the time he uttered them.  A law-writer, who has given
special study to the question, says that similar principles
govern the courts in ascertaining the legislative will, and
construing statutes and fundamental laws, to those which
control their action in announcing the doctrines of the com-
mon law, as applicable to the causes which come before them
for adjudication (Wells on *Res Adjudicata,* p. 554, sec. 604),
and it was said, too, while discussing the doctrine of *stare
decisis.*  Again, in this connection, he says: "The com-
munity to be affected by it (a former decision) have acted
upon it in a vast number of judicial relations; rights of
property which have grown up under it have changed hands
and passed through numerous ramifications, until it has
become imperative to regard it as a rule of property, which
no power can disturb.  What our present opinion may be,
as to the merits of the decision in that case, is now of no con-
sequence whatever.  In construing statutes, and the Consti-
tution, the rule is almost universal to adhere to the doctrine
of *stare decisis.*  This is an adjudicated question, and the
subject of its correctness is to us a sealed book."  *Ibid.,* sec.
605.  The same author, quoting from Mr. Fearne, says: "If
rules and maxims of law were to ebb and flow with the tastes
of the Judge, or to assume that shape which in his fancy
best becomes the times; if the decisions of one case were not
to be ruled by or dependent at all upon the former deter-
minations in cases of a like nature, I should like to know
what person would venture to purchase an estate without
first having the judgment of a court of justice respecting the
identical title which he means to purchase."  *Ibid.,* sec. 599.
And we add, what person would enter into a contract based
upon the meaning of a statute once construed, without first
taking a fresh opinion from the Court?  "Where a judicial
interpretation has once been put upon a clause, expressed in

a vague manner by the Legislature, and difficult to be understood, that ought of itself be a sufficient authority for adopting the same construction. *Buller, J.,* said: 'We find one solemn determination of this doubtful expression in the statute, and as that construction has since prevailed, there is no reason why we should now put another construction on the act on account of any supposed change of convenience.' This rule of construction will hold good, even if the Court be of opinion that the practical construction is erroneous; so that if the latter be *res integra* the Court would adopt a different construction. Judicial use and practice will have weight, and where continued for a long time will be sustained though carried beyond the fair purport of the statute." 2 Lewis' Sutherland on Stat. Const. (2 Ed.), sec. 475. *Lord Cairns* said: "I think that with regard to statutes it is desirable not so much that the principle of the decision should be capable at all times of justification as that the law should be settled, and should, when once settled, be maintained without any danger of vacillation or uncertainty." *Comrs. v. Harrison,* L. R., 7, H. L., 9. "Under the application of the doctrine contained in the maxim *(stare decisis et non quieta movere),* where a series of decisions, or even a single decision, of a court of last resort has been accepted as the proper interpretation of the law and has been acted upon and become a rule of property, the courts are slow to interfere with the principle announced by the decision, and it may be upheld even though they would decide otherwise were the question a new one." 26 A. and E. Enc. (2 Ed.), p. 161. We have repeatedly said that the weightiest reasons make it the duty of the Court to adhere to its decisions. *Weisel v. Cobb,* 122 N. C., 67.

But there is another well-grounded principle that enters into this case and should have a place in this discussion. It is clearly stated by *Lord Mansfield:* "When solemn determi-

nations · acquiesced under, have settled precise cases and
become a rule of property, they ought for the sake of cer-
tainty to be observed as if they had originally formed a part
of the text of the statute." *Wyndham v. Chetwood,* 1 Bur-
row, 419. We adopted that rule in *Long v. Walker,* 105
N. C., 109, where it was held that a former adjudica-
tion of the Court in construing a statute or the organic law
should stand, when it has been recognized for years, and in
such a case the principle settled or the meaning given to the
statute becomes a rule for guidance in making contracts and
also a rule of property, and that it should not be disturbed
even though the conclusion reached may not be satisfactory
to the Court at the time the same matter is again presented.
To the same effect are *Grantham v. Kennedy,* 91 N. C., 151,
and *Kirby v. Boyette,* 118 N. C., 244, in which case the
Court applying the doctrine of *stare decisis* and referring to
a principle which had been established by a decision of the
Court for thirty years, said: "Can this Court, consistently
with its constitutional obligation to adhere to decisions which
may have become a rule of property, alter or modify the
principle upon which the people of the State have been in-
vited to invest their money for so long a period? The propo-
sition upon which the contention of the petition to rehear is
based is unsound in law and cannot be acted upon without
grave danger to the rights acquired under a well-founded
confidence in the stability of judicial decisions. The theory
is that if a court, in the elucidation of the questions involved
in any given controversy, finds it necessary to crystallize the
law upon the subject into a clean-cut rule, which will prove
a guide to the profession, such rule may be abrogated after
it has been acted on for over thirty years, because the case
in hand might have been decided by stating the principle
governing the particular case, instead of the broader one
founded upon the reason of the thing, but decisive also of

HILL *v.* RAILROAD.

other cases as well as that at bar. To lend our sanction to such a view of the law would be to imperil the security of many principles upon which titles have been acquired under the advice of the most competent counsel. A due regard for vested rights necessarily constrains a court to reject such a theory as little short of revolutionary."

In *Young v. Jackson,* 92 N. C., at p. 148, this Court said: "The case cited was decided in 1875. It has been treated as a proper construction of the statute in question, and, as thus construed, it has been acted upon, no doubt, in many cases. To disturb it would unsettle titles and give rise to much confusion and injustice. We cannot think of doing so." "After the meaning of a statute," it is said in a work of high authority, "has been settled by judicial construction, the construction becomes, as far as contract rights acquired under it are concerned, as much a part of the statute as the text itself, and a change of decision is, to all intents and purposes, the same in its effect on contracts as an amendment of the law by means of legislative enactment, and contract obligations entered into or vested rights acquired while the former decision was in force cannot be impaired." 26 A. and E. Enc., 179. See also *Douglas v. Pike County,* 101 U. S., 677. "A change in judicial construction in respect to a statute should be given the same effect, in its operation on contracts and existing contract rights, that would be given to a legislative amendment—that is to say, its operation must be prospective, not retrospective." *Lewis v. Symmes,* 61 Ohio St., 471.

In considering the effect of overruling a decision upon existing contracts, the Court in *Falconer v. Simmons,* 51 W. Va., 177, said: "An overruled decision is regarded as not law, as never having been law, but the law as given in a later case is regarded as having been the law, even at the date of the erroneous decision. To this rule there is one exception:

143—37

that where there is a statute, and a decision giving it a certain construction, and there is a contract valid under such construction, the latter decision does not retroact so as to invalidate such contract."

This Court in *State v. Bell,* 136 N. C., 677, gave practical effect to the rule that the reversal of a precedent should not be allowed to work an injustice, by requiring that the case then under consideration should be tried anew, not according to the principle as then decided to be the correct one, but according to the former adjudication, simply because the party is presumed to have acted in reliance upon it. Was that not the only fair and proper course to pursue, and would any other have commended itself to our sense of right? The opposite ruling would have met with strong condemnation, as being contrary to the plainest principles of justice. Speaking of a like case, *Lord Kenyon* said: "It would be cruel not only to the defendant, but also to those in a similar situation with him, if we were now to punish him for doing that which this Court publicly declared so many years ago might be done with impunity, and which so many persons have been doing weekly for such a number of years." *Rex v. Younger,* 5 Dumf. & E. (Term Rep.), at p. 450. Of the same purport as the cases just cited is *Township v. State,* 150 Ind., 168, where the Court says: "Courts will not so apply a change made in the construction of the law as it was held to be in the overruled case as to invade what are considered vested rights, or, in other words, while, as a general rule, the law as expounded by the last decision operates both prospectively and retrospectively, still, courts are required to and do confine it in its operation so as not to impair vested rights, such as property rights or those resting on contracts express or implied." There are many decisions by the Supreme Court of the United States to the same effect. The doctrine is clearly stated in *Louisiana v. Pillsbury,* 105

U. S., 295 (quoting from *Douglas v. County of Pike, supra*), as follows: "The true rule is to give a change of judicial construction in respect to a statute the same effect in its operation on contracts and existing contract rights that would be given to a legislative amendment; that is to say, make it prospective, not retroactive. After a statute has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the text itself." And again, it is briefly put thus: "A change of decision is to all intents and purposes the same in effect on contracts as an amendment of the law by means of a legislative enactment." *Anderson v. Santa Anna*, 116 U. S., 356. The rule, in a somewhat modified form, is clearly and strongly stated in *Olcott v. Supervisors*, 16 Wall., 678, thus: "This Court has always ruled that if a contract, when made, was valid under the Constitution and laws of a State as they had been previously expounded by its judicial tribunals, and as they were understood at the time, no subsequent action by the Legislature or judiciary will be regarded by this Court as establishing its invalidity. Such a rule is based upon the highest principles of justice. Parties have a right to contract, and they do contract, in view of the law as declared to them when their engagements are formed. Nothing can justify us in holding them to any other rule." Cases from that Court may be cited almost without number, so frequently and consistently has the rule been announced. *Gelpcke v. City of DuBuque*, 1 Wall., 175; *Township of Pine Grove v. Talcott*, 19 Wall., 68; *Ins. Co. v. Debolt*, 16 How., 416; *Taylor v. Ypsilante*, 105 U. S., 74; *Boyd v. Alabama*, 94 U. S., 645; *Chicago v. Sheldon*, 9 Wall., 50. An excellent statement of the doctrine of *stare decisis* will be found in Black's Interp. of Laws, 375, *et seq.*, where it is substantially said that an authoritative judicial construction put upon a statute has the force

of law by becoming, as it were, a part of the statute itself. The importance of this rule arises out of the fact that the declared meaning is at once accepted as correct by those whose rights or whose business conduct may be affected by it, and many transactions may depend for their validity upon the permanence of the interpretation thus given to the words in question. "The Court almost always, in deciding any question, creates a moral power above itself; and when its decision construes a statute, it is legally bound, for certain purposes, to follow it as a decree emanating from a paramount authority, according to its various applications in and out of the immediate case." *Bates v. Relyea,* 23 Wend., 336. "We hold the doctrine to be sound and firmly established, that rights to property and the benefits of investments acquired by contract, in reliance upon a statute as construed by the Supreme Court of the State, and which were valid contracts under the statute as thus interpreted when the contracts or investments were made, cannot be annulled or divested by subsequent decisions of the same Court overruling the former decisions; that as to such contracts or investments, it will be held that the decisions which were in force when the contracts were made had established a rule of property, upon which the parties had a right to rely, and that subsequent decisions cannot retroact so as to impair rights acquired in good faith under a statute as construed by the former decisions." *Farrior v. Mortgage Co.,* 92 Ala., 176. This rule is one made by the law at the call of justice, and in obedience to the plain dictate of common sense, to protect a contract made on the faith of an exposition of the terms of a statute, in the former decision, and which should, as to that contract at least, remain unimpaired so that no detriment will come to parties who have thus dealt with each other in the honest belief that the same construction will be placed upon a statute, under which they have contracted and

which is expressed in identically the same language. It
is not unreasonable that they should be so influenced in their
conduct and not by the opposite belief that the court of last
resort in the State will so vacillate in its decisions as to give
two radically different constructions to the same words. A
court would stultify itself if it should hold that parties
should have acted upon any such belief.

The people are supposed to have confidence in their high-
est court, at least to the extent of ascribing to it the virtue
of consistency and a desire to see that by no lack of stability
in its decisions shall any citizen be jeopardized or prejudiced
in his rights, because he has simply acted upon the supposi-
tion that what the Court has so solemnly determined will
again be its decision upon the same state of facts, or that at
least, if it does change its mind, his rights and interests will
be thoroughly safeguarded. If courts proceeded upon any
different theory in the decision of causes, the people would
be left in a state of uncertainty as to what the law is, and
could not adjust their business affairs to any fixed and settled
principles, which would, of course, produce most mischiev-
ous, if not disastrous, consequences. A court, therefore, is
not always at liberty to inquire, in passing upon a case before
it, what is the law, for investigation should sometimes stop
when it has been ascertained what has already been decided
on the subject. Wells Res. Adj., sec. 598. In *Los Angeles
v. Water Co.,* 177 U. S., 575, the Court sums up the clear
result of all the authorities, citing many cases, as follows:
"At the time of the contract of 1868 and of the passage of
the ratifying Act of 1870 it was established by the decision
of the highest court of the State that the Constitution of the
State permitted a grant of special franchises to persons and
corporations, and permitted the latter to receive assignments
of them from such persons or grants of them directly from
the Legislature. This law was part of the contract of 1868,

as confirmed by the Act of 1870, and could not be affected
by subsequent decisions."

There is still another principle, in some respects like
the one just discussed, that we should consider in this con-
nection. It is thus stated in *Bradley v. Ballard,* 55 Ill.,
419: "While courts are inclined to maintain with vigor
the limitations of corporate action, whenever it is a question
of restraining the corporations in advance from passing be-
yond the boundaries of their charters, they are equally in-
clined, on the other hand, to enforce against them contracts,
though *ultra vires,* of which they have received the benefit.
This is demanded by the plainest principles of justice." A
full discussion of the doctrine will there be found, with the
citation of many cases to sustain it. *Thompson v. Lambert,*
44 Iowa, 239; *Sheldon v. Eickemeyer,* 90 N. Y., 607; *Stokes
v. Detrick,* 75 Md., 256; Thompson on Corporations, sec.
4534; Noyes Intercorp. Rel., sec. 196. And the doctrine of
laches also applies to acts alleged to be *ultra vires.* The
illegality of corporate acts must be promptly exposed, and
relief will be denied the corporators who wait until the evil
has been done and the interest of innocent third parties has
become involved. *Zabriskie v. Railroad,* 23 How. (64 U.
S.), 381. The objection of a stockholder to the lease of a
railway company alleged to be invalid, comes with bad grace
after he has received the profits of the completed transaction.
He will not be permitted in this way both to approve and dis-
approve the act of the corporation. *Dimpfell v. Railway Co.,*
110 U. S., 210. The general principle deducible from the
authorities is that if the alleged illegal transaction has been
fully consummated and large expenditures of money have
been made, the benefit of which has been received by the
corporation and the objecting stockholder, and the rights
of third parties have intervened, so that the *status quo* can-
not be restored, and the cancellation of the contract upon

the ground of its being *ultra vires* would defeat justice or work a legal wrong, a court of equity will interfere, if at all, only at the instance of the State. Thompson on Corp., sec. 8438, and secs. 8318 to 8323.

The case of *Railroad Co. v. Railroad Co.*, 145 U. S., 393, is directly in point and "on all fours" with this case. If anything, the plaintiffs in this case can have less ground on which to stand and demand relief than did the plaintiff in that case. The difference, if any, between the two cases is in favor of the present defendants. There the plaintiff company leased its road to the defendant in perpetuity, which leasing the Court held to be invalid. The lessor brought the suit to cancel the lease as being *ultra vires*, but the Court refused to entertain its bill upon the ground that the contract had been fully executed, and further held that both the corporation and its stockholders were barred by laches, and in this connection it says: "When the parties are *in pari delicto,* and the contract has been fully executed on the part of the plaintiff, by the conveyance of property or by the payment of money, and has not been repudiated by the defendant, it is now equally well settled that neither a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or money paid under the contract. Upon this state of facts, for the reasons above stated, the plaintiff, considered as a party to the unlawful contract, has no right to invoke the assistance of a court of equity to set it aside. And so far as the plaintiff corporation can be considered as representing the stockholders, and seeking to protect their interests, it and they are barred by laches." It would seem impossible to distinguish the two cases in this respect. See, also, *Hardwood v. Railroad,* 17 Wall., 78; *Rabe v. Dunlap,* 51 N. J. Eq., 40. This Court has recently given its assent to the same principle, as one not only just in itself, but as peculiarly fit to be applied to such cases, when

parties have waited, especially when they had full knowledge of the facts and, as the very nature of the transaction shows, when new rights and interests necessarily have arisen, before they invoked the aid of the Court. It was there held that when a stockholder fails for two years to bring an action to annul a consolidation of two corporations alleged to be *ultra vires,* and in the meantime the agreement has been fully executed and third parties have acquired interests in the consolidated company, a court of equity will not grant the relief demanded, namely, that the transaction be set aside. *Spencer v. Railroad,* 137 N. C., 107.

These principles clearly apply to this case, for the Court has found as facts that the lease was made and all the dealings between the parties were conducted in good faith and with an honest purpose, and that there has been a transfer of a large number of the lessor's shares of stock and other transactions which involve the interests of third parties; that the plaintiffs Foy and the Board of Commissioners have accepted and appropriated to their own use the dividends paid to them, which were so paid from money received from the lessee, under the terms of the lease; that large expenditures have been made by the latter, and that the plaintiff Hill kept his dividend check for six weeks without objection. These and many other facts found by the Court and already stated, show how grossly inequitable it would be to listen with favor to the plaintiffs' appeal for relief.

While we have discussed the case in some of its aspects upon the plaintiffs' assumption that the lease is void, it must not by any means be inferred that we assent to that proposition, because we do not think they can at this late day be heard to say that it is *ultra vires,* this Court having said most positively and unequivocally that it is not. We must accept that decision as a final and conclusive exposition of the words of the charter under which the lessor claimed the

right to lease its franchise and property. It is not, there-
fore, *ultra vires,* because this Court has said that it is not,
and that is quite sufficient for our guidance, and as irrevo-
cably fixes the meaning of the words of the charter as if they
had been so unmistakably interpreted by the Legislature, and
that very meaning had been written into the charter by it
and the power to lease had thereby been expressly given with-
out leaving any room for construction. The authorities
applicable to this view of the case have been copiously cited.

Before closing this opinion we must direct attention to
the exact analogy, nay, the precise sameness, word for word,
between the charter of the lessor in this case and that of the
North Carolina Railroad Company, which was construed
in *State v. Railroad,* 72 N. C., 634, and *State v. Railroad,*
73 N. C., 527. The one is manifestly a literal copy of the
other. Upon what rule of construction can it be argued that
where there is an intent to express the same idea and evi-
dently to confer the same power, we should give to the words
employed by the Legislature two different and opposite in-
terpretations, and thus defeat that purpose? Identity of
language necessarily implies identity of meaning, and every
principle of logic and fair construction requires us so to
decide. The two clauses were inserted in the charters of the
respective companies whose railways constitute, with the
Western North Carolina Railroad, one continuous State line
from the mountains to the seashore, now under the control
of the Corporation Commission, which body can compel
proper connections and traffic arrangements for the con-
venience of the public. Two of these charters were granted
at the same session of the General Assembly (1854-5) and
the other a few years prior thereto (1849), and they were
framed necessarily with a common intent and therefore ex-
pressed in identical words. We have not been endowed with

faculties so subtle and so acute as to be able to distinguish between things not merely similar, but exactly the same.

In *Logan v. N. C. Railroad Co.,* 116 N. C., 945, *Mr. Justice Avery,* speaking for the Court, says: "The question of the authority of the lessor company 'to farm out' its franchise and property to the lessee is no longer an open one. *State v. Railroad,* 72 N. C., 634." This was said in 1895, just twenty-three years after the decision in the principal case. In *Harden v. Railroad,* 129 N. C., at p. 356, decided in 1901, *Mr. Justice Clark,* while expressing a possible doubt as to the correctness of the original construction of the charter of the North Carolina Railroad Company, yet said for the Court that it was not "a new question" (*res integra*), and therefore not open for reconsideration. Numerous other cases, decided both before and after that time, have in the same way recognized the construction of the words of the charter to which we have so often referred, as a settled one. There are findings of fact in this case to the effect that the executive department of the government has accepted this Court's former construction of the words "to farm out" as the correct one and acted upon it by taking part in making a lease of the North Carolina Railroad Company to the Richmond and Danville Railroad Company, first in 1872 and again in 1895, and also in leasing the franchise and property of the Atlantic and North Carolina Railroad Company to one Best in 1881, two Governors of the State having actually participated in making the leases of the Atlantic and North Carolina Railroad Company, and the State holding the majority of the stock in each of the lessor companies, and having, therefore, the power to control their action, through its proxy and the directors appointed in its behalf.

The fact that the intention to make a lease must have been known to the public for some time prior to its final execution, as the notice of the meeting, while not conforming strictly to the requirement of the by-laws, must have been

seen and read by many, and was actually known to two of
the plaintiffs, and the additional facts that no other stock-
holder resorted to any legal measures to prevent its execu-
tion, and that the State, holding a majority of the shares
of stock and a controlling interest in the corporation, ap-
proved and voted for the lease, through its proxy or other
representative, and its directors afterwards ratified it, and
that through its Governor it helped to carry out one at least
of its important provisions, furnishes plenary proof that the
public generally acquiesced in the construction which this
Court had placed upon the words used in the charter, as the
State in its corporate and sovereign capacity, in attending
meetings by proxy and receiving dividends from the North
Carolina Railroad Company and in other ways, had done for
many years. Under such accumulated circumstances show-
ing an acceptance of this Court's interpretation of those
words, should it now be open to challenge by the plaintiffs?
We clearly think not. It also appears that in 1897 a bill
was introduced in the House of Representatives for the pur-
pose of annulling the lease of the North Carolina Railroad
Company to the Southern Railway Company, the successor
of the Richmond and Danville Railroad Company, and that
during the debate upon that bill several members assailed
the lease of 1895 upon the ground that it was *ultra vires,*
and that about the same time the then Governor of the State
threatened to attack the lease, and that in 1897 a suit was
brought in the Superior Court of Craven County to enjoin
the leasing of the franchise and property of the Atlantic and
North Carolina Railroad to another company, and that a
restraining order was continued to the hearing by the Judge
of that Court upon the ground that such a leasing would be
*ultra vires,* notwithstanding the decisions of this Court in
*State v. Railroad,* 72 N. C., 634, and 73 N. C., 527. It is
stated that the bill failed to pass in the House, and as the

Legislature took no action to prevent the making of the lease of the North Carolina Railroad to the Richmond and Danville Railroad Company or the Southern Railway Company, and has never attempted to have the same annulled, it would seem that the legislative department is committed to the validity of the lease. The Governor's threat, made in 1897, should have no influence in this case, in any view, but it may also be said of it that it was contrary to the well-defined policy of the executive department both before and after his incumbency.

As to the ruling of the Judge of the Superior Court, it can add nothing to the case in favor of the plaintiffs, he not having appellate jurisdiction, and besides, his ruling was seemingly erroneous upon a well-settled principle which requires the lower courts to respect and observe the decisions of this Court until they are overruled or reversed.

We have discussed these matters because the facts are in the case and to exclude the inference that we had overlooked them, but we consider them as manifestly irrelevant and as being entitled to no weight in forming our conclusion, except the facts found by the Judge, which tend to show that executive and legislative sanction was given to the construction of the charters which this Court adopted years ago.

As by virtue of the authority vested by the law in us, we require respect for submission to our decisions, we should not do less than render the same degree of respect to them ourselves, and not overrule them, even if we should differ from our predecessors, who were as able as we to decide wisely, impartially and correctly, unless the injury is so great as to imperatively demand such action, and provided that in doing so we do not commit a greater wrong and inflict greater injury than we would by adopting the opposite course. If we have overruled cases in the past, it was because we found that no appreciable harm would be done in those particular

instances.    We have unanimously overruled a case at this
term, and reinstated a former precedent, precisely for the
reason that no rights had accrued under the overruled case
and no injury would therefore result, but on the contrary, to
let it stand and thereby set aside the former precedent, which
it had itself overruled, would have greatly impaired if not
utterly destroyed rights which had been acquired upon the
faith of the correctness and stability of the first decision.

No principle of the law has been more carefully preserved
and cherished than the one embodied in the ancient maxim
of *stare decisis,* which has been found to be essential, under
an enlightened public policy, to prevent wrong and to execute
simple justice.    The people yield submission to the law, as
expounded by the courts, because they have respect for their
judgments and confidence in their integrity of purpose; but
if by a shifting and vacillating course of decision the law
becomes unsettled, and inevitable disaster and oppression
follow the uncertainty thus created, they will forfeit that
respect and confidence which Judges should so much desire
and which is so important to the proper administration of
the law and to the welfare of the State.    The people may
then well say to us: "Keep (not) the word of promise to
our ear and break it to our hope."    Better it will be to be
guided by that salutary and conservative maxim of the com-
mon law, which our predecessors so much revered and have
admonished us to follow, and which an eminent author has
said "furnishes indubitable evidence of the law-abidingness
of the English-speaking people, a feature which is indelibly
stamped upon every aspect of their civil and political life."

The defendant's counsel contended that a plaintiff must
have a case of substantial merit when he applies to a court
of equity for relief, and that no such case is presented in this
record.    We have refrained from discussing that phase of the
case at length, though there is much to be said in regard to

it.   How the plaintiffs have been prejudiced in any way as stockholders, we have been unable to see, as the market price of· the stock has advanced from $30 to $70 per share since the lease was made, their property has been enhanced in value by improvements and betterments and the lessor company has apparently a brighter prospect than it ever had before, as under the former management it was in a languishing condition.   But notwithstanding the plaintiffs have not as yet been substantially damaged in the least, we have considered their case upon its legal merits, and as if they had been, or upon the assumption that whether substantially damaged or not, they may as stockholders attack the validity of the lease, and further as if they had really brought this suit in good faith to right what they conceive to be a wrong.

His Honor, *Judge Long,* though himself expressing a doubt as to the correctness of the former rulings of this Court, deemed it his duty, as he declared, to follow the settled rule of the law and not to disturb the construction of words more than once solemnly adjudicated.   After a most careful and intelligent statement of the facts and an able and forceful presentation of the law of the case, his Honor held that the lease is valid and that the plaintiffs are not entitled to the relief they demand, and, having so found, he adjudged that the action be dismissed at the cost of the plaintiffs.   In the findings of fact, in the opinion of the Court as to the law and as to its duty in the premises, and in the judgment rendered, we fully concur.

Before concluding we must advert to another matter which it seems to us affects the integrity and authority of this Court.   It is always a matter for regret when any questions are brought into discussion which have no proper place in a judicial opinion of any kind, and especially where those questions not only do not relate to the law of the case, but are entirely foreign thereto, and, while of public importance,

are only political in their nature and fit subjects for debate on the hustings or in the legislative hall, and not in this forum. We must decline to enter upon the consideration of any such matters, but confine ourselves to the facts stated in the record and the law arising thereon, as we are enjoined to do and as the good example of our predecessors, if nothing else, should lead us to do. If we unsettle the foundations of the law by substituting our own individual opinion of what is right, often biased and prejudiced, for the safer, wiser and more temperate rule of the law, we will surely bring discredit upon our decisions and justly merit, as we will certainly receive, the condemnation of the people.

We find no error in the rulings of the Court.

Affirmed.

BROWN, J., concurring: I concur fully in the able and exhaustive opinion of *Mr. Justice Walker,* who speaks for the Court in this case. As to whether the lease of the Atlantic and North Carolina Railroad was wise or not is not for this Court to say. Suffice it that it was made by the administration of Governor Aycock, an able and patriotic son of our State, after long and patient consideration and supported by a well-defined and pronounced public sentiment, so much so that the succeeding General Assembly refused to take any steps to disturb it. The State and other stockholders are now in receipt of a large revenue from it—something they never received before. I shall not discuss the wisdom or folly of government ownership of railroads, State or National. Those who wish to be informed as to the wretched failure of this State in managing and owning railroad property will do well to read the able article of the Hon. Thomas B. Womack on the subject in the December number, 1906, of *World's Work.* The reader will also be enlightened as to the enormous losses of the States of Missouri and Pennsyl-

vania, when engaged in similar business, by reading the instructive article of Mr. C. M. Keys in the same number of that magazine.

CLARK, C. J., dissenting: Passing by the patent objections (1) that the so-called lease was made at a meeting irregularly called, due notice thereof not having been given as required by the charter, and held at a place not designated in the call; (2) that the deposit of bonds required by the lease to be made before the lease should become effective has not been made as stipulated, and (3) that freight rates have .already been increased in violation of the express provision that this should not be done, which was an indispensable agreement without which the lease would not have been made, we will come at once to the fatal defect, that the company was without any power whatever in its charter to lease out its property and franchises and thus wholly abdicate the discharge of those duties in consideration of the undertaking to render which its charter and franchises were granted. All authorities concur, and even the defendant admits that the lease could not be legally made unless in the charter, or by special act of the Legislature, the power to lease was expressly conferred. "The lease by a railroad company of all its road, rolling-stock and franchises for which no authority is given in its charter, is *ultra vires* and void," says the highest court of the Union. *Thomas v. Railroad,* 101 U. S., 71; *Railroad v. Railroad,* 118 U. S., 290; *Transportation Co. v. Pullman,* 139 U. S., 49.

The attempted lease is all the more objectionable in this case, because not only is there no such power in the charter, or in any statute, but the State being the owner of a great majority of the stock, the control of this great work, held in trust for all the people, and for future generations, should not pass to the hands of a non-resident syndicate to be operated for their profit and emolument and in furtherance of

their own policies of aggrandisement, and to the destruction
of the last hope of the accomplishment of the great public
policy of a system of State Internal Improvements so wisely
laid out and planned by our fathers and paid for out of a
constricted public treasury, without consulting the people of
the State represented in their Legislature, when the General
Assembly was to assemble within less than four months.
There should have been a halt made before the control of a
great piece of public property, built out of the taxes of the
people, was handed over to strangers, and put beyond further
operation in the public interest, until at least the people
whose property it was could have been consulted.   The haste
of the lessee to accomplish this transfer without consulting
the real owners of the property and their Legislature—the
only body which had power to confer a right to lease it—
must be noted.   Why was not the opportunity given the
General Assembly to express the public wish as to this dispo-
sition of so large a part of the State's property?   Why was
not time allowed at least to give due notice of the meeting
as required by the charter, and why was not the meeting
held at the place named in the call?   Why were not the bonds
stipulated to be deposited so deposited before the lessee took
possession of the State's property, and why has the stipula-
tion against an increase of rates, without which the contract
would not have been made, been so soon ignored and disre-
garded?   All these indicia of haste would be potent in con-
sidering the validity of a transaction in which private parties
engaged; why should they not be considered and weighed when
they concern the transfer forever from the people of the State,
without consulting their representatives in the General As-
sembly, of the control of so great and valuable a property,
and which is on the point in the near future of becoming
immensely more valuable with our increasing wealth and
population, and the retention of the control of which would,

143—38

by the State's regulation of its rates and charges, be so important a factor and check upon the rates charged by the other railroads of the State which have passed into the control of other non-resident syndicates?

Section 18 of the charter provides as follows: "The said company may, when they see proper, *farm out* the right of transportation over said railroad, subject to the rules above mentioned, and the said company and every person who may have received from them the right of transportation of goods, wares and produce on said railroad shall be deemed a common carrier as respects all goods, wares and merchandise entrusted to them for transportation."

It must be apparent to any one who reads that paragraph of the charter that it did not authorize the company to make any lease of all its rights, properties and franchises; yet that is the sole reliance of the defendant in its search for legislative power conferred to make the lease. The meaning of these words cannot be more clearly stated than by *Bynum, J.,* 72 N. C., at p. 648, who, after stating that not a single decision in this State or elsewhere had ever maintained such a construction—and it may be added that not one here or elsewhere has done so since—adds: "A right of transportation *over* a road is one thing, and the road itself with its engines, shops and property is certainly another, and these can no more be confounded than rent can be with the land out of which it issues. One is a right of passage over the *corpus,* the other is the *corpus* itself. A lease of the road would carry the right of transportation as an incident, but the right of transportation would not carry the road, for if so, every wagoner at a toll-gate who buys a ticket over a turnpike for a year or a term of years thereby acquires a lease of the road and its management. Nothing is more common than for all roads, with connecting lines, to farm out the right of transportation over their lines, and in

this day of close connections and rapid transit the practise is indispensable to successful business. We every day see this right farmed out to express companies and by one company for the cars and freight of another and for special purposes. At many of our depots we see freight cars painted and marked the 'Yellow Line,' the 'Green Line,' the 'Blue Line.' What does it all mean? These cars belong to vast incorporated companies of these names which are doing nearly all the fast transportation of the United States; yet they do not, as I am informed, own a mile of road. Their business is to furnish cars and freight which they agree to deliver. In order to do so, they hire or farm from the railroad companies the right of transportation over their lines at stipulated rates and speed. One company furnishes the road and motive power and farms out the right of transportation to the other company, which supplies the rolling-stock and delivers the freight." *Judge Bynum* then proceeds and conclusively shows the origin and use for 200 years of the term "farm out the right of transportation" and how it came to be inserted in railroad charters, and that its signification has always been as above stated, and has never at any time been understood as conferring the right to sell or lease the railroad property and franchises. He then truthfully added: "No authority or decision is cited to sustain this lease, and we may fairly conclude that the judgment here is without a precedent."

The foregoing is quoted from the dissenting opinion of *Mr. Justice Bynum* in *State v. Railroad,* 72 N. C., 640. That dissent was well received by the profession at the time and, the writer believes, has since been generally deemed by it as the true statement of the law, like *Judge Iredell's* famous dissent in *Chisholm v. Georgia,* 2 U. S., 419, and *Justice Brown's* dissent in Income Tax Case, *Reagan v. Trust Co.,* 154 U. S., 362. The opinion of the Court was supported,

as *Judge Bynum* said, by not a a single citation then, and no opinion has been since rendered that sustains it. On the contrary, on every occasion in which it has since been referred to, this Court has either markedly refrained from endorsing it or has intimated against its correctness.

The able and learned counsel in this case did not argue that this isolated decision was correct, nor is the opinion of the Court herein based on its correctness. The defense rest their case upon the doctrine *stare decisis*—and though "decisis" is in the plural, the defendant's counsel presented but that single case. When a decision is wrong this Court has overruled it, though it has been again and again repeated, notably *Hoke v. Henderson,* 15 N. C., 1; *Watson v. Watson,* 56 N. C., 400, and there are many others. Certainly when there is only one decision, and that is clearly wrong upon its face, is supported by no precedent, before or since, and is opposed to the public policy of the State, it would be singular if the courts were compelled to repeat the error instead of correcting it. Nor can the doctrine that the decision has "become a rule of property" be invoked. Railroad leases are not a matter of everyday dealing. This is the first time since the case in the 72 N. C. that the construction of such a clause has been presented to the Court. The clause construed is not even a provision of a general law, but is merely a clause in a private act, and now a similar clause in another private act is before us. If the former construction was wrong, now at the first opportunity it should be corrected. The former decision after it was made was conclusive between the parties thereto and as to that charter. It would not have been conclusive even between the same parties in a second lease, especially after the doubt cast upon it, and for this reason when a second lease was proposed it was signed at midnight to avoid an injunction from a State court and the lessee obtained in the Federal District Court a validating decision,

which is not put upon the correctness of the decision in the 72 N. C., 634. The Judge *(Simonton),* a good lawyer, was careful to put his ruling upon the sole ground that the Supreme Court of the State had so held. *Southern Railway Co. v. N. C. Railroad Co.,* 81 Fed., 595.

A construction by the Court of one private statute does not establish a rule of property as to rights claimed under another private statute, although the language of the two may be similar, or even identical. *Williamson v. Berry,* 8 How. (U. S.), 495; *Hatch v. Burroughs,* 1 Woods, 439; *Barber v. Railroad,* 166 U. S., 43; *Wood v. Brady,* 150 U. S., 18. The charters of both the North Carolina Railroad and of the Atlantic and North Carolina Railroad have been held to be private statutes. *Hughes v. Commissioners,* 107 N. C., 598; *Durham v. Railroad,* 108 N. C., 399; *Logan v. Railroad,* 116 N. C., 940.

Besides what is above said, this lease should not be held valid because of an erroneous decision, between other parties, construing a clause in another and different private act, and which decision has never since been held correct, for many reasons, among them:

(1) When *State v. Railroad,* 72 N. C., 634, was decided it received the vote of but three Judges out of five, and the lower Court *(Albertson)* had held against its validity. It has been argued that the lease having been made by the executive department, charged with operating the property, the courts should not intervene. It is clear that this is a mistaken view, for to the legislative, not to the executive department, belonged the function of permitting the property to be leased, and the trust confided to the State directors by the statute was to operate the State's property, not to lease it and pass its control away from the State into alien hands, as was well said by *Bynum, J.,* in 72 N. C.

(2) The decision in the 72 N. C., 634, was not only called in question by the division of the Judges, and the inherent

error apparent on inspection, but it has never been held to be correct since, not even (as we have seen) in the opinion in the Federal Court, 81 Fed., 595, which sustained the second lease of the North Carolina Railroad, not because the decision in 72 N. C., 634, was correct, but simply because it had been made in a case to which that railroad had been a party. In the following cases only has it been referred to in this Court since, and in not one of them with approval: In *State v. Railroad,* 73 N. C., 529, *Rodman J.,* who had not sat in *State v. Railroad,* 72 N. C., 634, because interested as a stockholder in the North Carolina Railroad, referred to the said decision in the 72 as *res judicata* (which it was as between the parties), and held that the State could not forbid the lessee to change the gauge. He placed his opinion in the 73 N. C. on the ground that the Legislature could not forbid the change of gauge upon the since wholly discredited and overthrown doctrine that the State could not in any respect regulate the management of the railroad, neither its rates of fare and freight nor the location of its station-houses nor any other detail of its economic management. *Bynum, J.,* again dissented, and time has vindicated his judgment. Indeed, *Pearson, C. J.,* had long previously, in *State v. Matthews,* 48 N..C., 459, held the true doctrine that the Legislature, notwithstanding the charter, could "afterwards regulate the speed at which the cars shall run" and control railroads in other respects, adding "the sovereign being presumed to reserve to itself the right of regulation of all such matters in the absence of an express contract to the contrary."

*State v. Railroad,* 72 N. C., 634, was first mentioned again in 116 N. C., 945, where this Court merely said that the validity of the lease was *"res judicata"* between the parties, but no intimation was given that it had been correctly so held. In 120 N. C., 624, the General Assembly addressed an inquiry to the Supreme Court, in whose reply, through

*Chief Justice Faircloth,* it is said: "Without expressing any intimation either way upon the question whether the power to lease its road is vested in the North Carolina Railroad Company by its charter," etc.   The inquiry was upon a clause in a pending bill by which it was sought to validate the new lease of the North Carolina Railroad.   The Court refused to say that the decision in 72 N. C. was correct, and the bill did not pass.

*State v. Railroad,* 72 N. C., 634, was next mentioned in *Harden v. Railway,* 129 N. C., 358, where the Court, referring to the second lease of the North Carolina Railroad, said: "*If* the lease is valid because made subsequent to the decision of a divided Court in *State v. Railroad,* 72 N. C., 634," etc., and also said, p. 356: "If it were a new question the Court might possibly hold with *Judge Bynum.*"   The Court thus recognized that as to the North Carolina Railroad the matter was *res judicata,* but refused to approve the decision. The next and last reference was made by *Mr. Justice Connor* in *Land Co. v. Hotel,* 132 N. C., 533, where he says: "*Bynum, J.,* in his very able dissenting opinion in *State v. Railroad,* 72 N. C., 645, says: 'No railroad scheme was ever devised by more of the wisdom and patriotism of the State. It was intended to be in fact what it was in name, the *North Carolina Railroad,* which, when completed from the Atlantic to the Tennessee line, would radiate a uniform system of lateral roads connecting all parts of the State in a common brotherhood by an easy and convenient intercommunication of trade and travel.' "   *Judge Connor* further says (p. 534): "It is difficult to believe that the policy of the State for nearly a century was to be reversed and the prospective seaport was to be hampered by the grant of the absolute ownership of the entire water-front thereof, separate and distinct from the ownership of the abutting lands; that the State was to part with this property which it held in trust for all of its

citizens.   Nothing save a clear declaration of such purpose would justify such conclusion." This was found so "difficult to believe" that *Judge Connor,* speaking for us, held that we did not believe it.   Certainly, then, we cannot believe, without "a clear declaration of such purpose," that the State intended to grant away the control, not merely of a waterfront, but of the line of railroad which she had built to that port and "held in trust for all its citizens."

Thus we see that the solitary case invoked to wrest this property from the State was not only, as *Judge Bynum* said, "without authority or decision cited to sustain it and without a precedent," but it has received no support since from any decision in any other court, and always, when referred to since in this Court, it has either been cited only as being *res judicala* of that particular lease or a strong intimation of its doubtful character was recorded.   This, as well as the other circumstances calculated to discredit its authority, were well known to the defendant, and it took this lease little more than ninety days before the Legislature would meet, which could alone confer the power to lease, according to the decisions of the United States Supreme Court and all other precedents, and now asks us to hold such lease valid because of that one entirely unsupported decision.   The lessee knew it had been questioned and doubted.   It took with notice that it was not an "approved precedent."

(3)  The citation of the lease of the North Carolina Railroad Company is peculiarly unfortunate.   The history of the means by which that first lease was procured is not in this record, but there was nothing in its negotiation which could recommend it as a precedent.   The company now operating it as lessee reports to the Corporation Commission that it made, for the year ending 30 June, 1906, over $1,000,000 net profits after paying the rental, all operating expenses of all kinds, including maintenance of equipment and of

roadway, damages, salaries, taxes and charges of all kinds. Thus the people of the State have paid the rent and taxes for the lessee and all expenses of every kind, and we are presenting the lessees in addition yearly a net profit of over $1,000,000. The Corporation Commission Reports are as official as those of this Court or of the State Treasury, and may properly be referred to. With this annual loss of over $1,000,000 to the people of the State from the decision of a divided Court, which decision has not since been approved, we might well refuse to approve it now, when another piece of the State's property is about to pass from its control and the sole authority invoked is that decision. This leasehold of the North Carolina Railroad, which cost the lessee nothing, and on which the people are paying the rent and all expenses, besides making the lessee an annual present of over $1,000,000, is said to be counted in its mortgage as worth $12,000,000—a princely gift. In truth, on a 4 per cent. basis, the lease is worth $25,000,000, and this value will increase unless rates of transportation are largely reduced.

If the lease is *ultra vires* there could be no ratification of it. If the words conferring the right "to farm out transportation *over* the road" could not confer on the company the right to lease the road itself and all its property and franchises, certainly the receipt of rent from an illegal lease could not confer the power to lease which the Legislature has not given.

In *Railroad v. Railroad,* 130 U. S., 22, *Miller, J.,* said, quoting *Railroad v. Riche,* L. R., 7 House of Lords, 653: "A contract not within the scope of the powers conferred on a corporation cannot be made valid by the assent of every one of the shareholders, nor can it by any partial performance become the foundation of a right of action." This is cited and approved in *Transportation Co. v. Pullman,* 139

U. S., 55. In the same case and in *Thomas v. Railroad,* 101
U. S., 83, is a full collection of authorities from the highest
courts in this country and in England, all holding that "a
railroad company has granted to it by charter a franchise
intended in large measure to be exercised for the public
good, the due performance of those functions being the con-
sideration of the public grant, any contract which disables
the corporation from performing those functions, which un-
dertakes without the consent of the State to transfer to
others the rights and powers conferred by the charter, and
relieve the grantees of the burden which it imposes, is a
violation of the contract with the State and is void as against
public policy."

Repeated reference has been made in opinions of this
Court to the wise and patriotic system of railroads which our
fathers planned and built. Seventy years ago they began
with an efficient system of State regulation of railroads by
the only practical plan of State ownership. Now when all
the world has turned to that system, by either taking over the
sole ownership or a controlling interest—save only this coun-
try and England, in both of which the tide is setting in the
same direction—we have before us the question of the valid-
ity of transferring to alien hands the last piece of the State's
once magnificent patrimony.

It may be well to recall the method by which that patri-
mony has piece by piece disappeared, as shown in our statutes
and judicial reports and by common knowledge:

As long as the Wilmington and Weldon Railroad Com-
pany received a bare support from a sparse population and
an impoverished country it was undisturbed, but as soon as
it gave unmistakable signs of becoming profitable a syndi-
cate, by insisting that the State could not properly manage
the road because it had not till then been profitable, procured
the passage of an act by which the State exchanged its shares

in that road for the same face value of its bonds.  As those bonds were then quoted around 35, and there is good reason to believe that the stock has since been watered more than 25-fold—*Douglas, J.,* in *Corporation Commission v. Atlantic Coast Line Railroad,* 137 N. C., 25—the syndicate is now receiving dividends on more than $70 from the public for every $1 invested in acquiring from the State this valuable property.   Next the North Carolina Railroad gave signs of becoming valuable, and then the present Northern syndicate made it a leasehold property, now worth over $25,000,000, from which they receive an annual profit of over $1,000,000, as we have seen; next came the Raleigh and Gaston and Raleigh and Augusta Railroads, whose State stock was acquired by the process of being exchanged for depreciated State bonds, and their stock has been watered 6-fold; then the Western North Carolina Railroad was sold for a beggarly sum and bonded and stocked (as the Railroad Commission Reports of that day showed) for $74,550 per mile, on which the public are to pay dividends and interest.   And now the last fragment of the State's great system, the Benjamin of our hopes, is to pass into alien hands.   It lingered last only because it was the last to show signs of coming profitableness.

In *Railroad v. Wellman,* 143 U. S., 339, the Supreme Court of the United States held that if a Legislature fixed rates that would permit a railroad company to earn 4 per cent. net on the true value of its property, after purging its expense account by legal investigation from exorbitant salaries and illegal disbursements, the courts could not interfere.   As the State now parts with the control of its last railroad on the ground that it has not hitherto been profitable, it is well to recall that the same pleas were made by syndicates who were anxious to relieve the State of the burden of the other State railroads now so profitable, and that

if they had not been hearkened to, the people of this State would now be paying no taxes of any kind whatever, or would be receiving reduction in freights and fares of the amount of all their taxes. Illinois and New Jersey are both free from payment of any or a large part of their State taxes by reason of those States acting wisely as to its ownership of railroads.

By the report of the Corporation Commission for the present year, it appears that (using round numbers) the State taxes are $2,500,000, county taxes aggregate $2,500,-000, town taxes $1,500,000, school taxes $1,500,000—a total of $8,000,000 of taxes. During the same time the receipts of railroads within this State from intrastate freight and passengers and its pro rata, according to mileage, from through traffic, was (counting on the same rate of increase since 30 June) over $23,000,000. Their expenses, by their own showing, unpurged as suggested in the above decision in the 143 U. S., was $17,000,000, leaving $10,000,000 net profits, most of which has been carried out of the State to our impoverishment. Not all of this has been earned, it is true, on the railroads whose controlling interest was once owned by the State which could have thus retained an efficient control. These figures are pertinent, and should well make us pause before we hold valid this passing over to alien hands of the State's last property upon the authority of a single decision, erroneous on its face, without precedent when delivered by a divided Court, and which has not been since approved, not even in this case, nor has it been followed till now.

We were told on the argument that the lease should be favored, if the law was doubtful, because State management was bad and free passes had been illegally issued. These arguments would have been more in place in an argument before the General Assembly upon an application for author-

ity to lease, but if it was admissible for counsel to present it, it is not improper to say that the publicity possible under State ownership enabled the discovery to be made of this handful of illegal passes issued by the Atlantic and North Carolina Railroad Company. What would have been the discovery if the same calcium-light of publicity had been turned upon the syndicate-owned railroads? Would it have been better? In *State v. Railroad*, 122 N. C., 1069, *Douglas, J.*, states that the number of free passes in this State were then over 100,000.

As to the management of the railroads under private ownership, it has been more profitable certainly, but profitable to whom? Not to the public, who pay into the treasuries of the syndicates over ten million dollars in excess of all expenses and some seven million five hundred thousand dollars after paying their taxes and rentals, and after allowing 4 per cent. net profit on the $70,000,000, at which they list the true value of their properties. Is there any cause in this to increase the number of privately owned railroads at a loss to the State of her last remaining railroad?

But finally, we were told by their counsel that these corporations are at least better managed than when in the State's hands. Are the daily reports of wrecks, deaths of passengers and employees, missed connections and delayed freights fewer than when the State owned the railroads and public opinion exerted a direct pressure upon officials? Are the salaries of the higher officials less, or the pay of the working force greater, or their hours shorter than when the officials in charge of the railroads knew that the public eye was upon them and the public could command their faithful discharge of duty.

When the divided Court in 73 N. C. denied the right of the Legislature to regulate the gauge, *Judge Bynum* asserted that the State did have that power, and with prophetic vision foretold that the gauge would be changed back and that there

HILL *v.* RAILROAD.

would be the same gauge throughout the Union. It has come to pass. He also said this, 72 N. C. at p. 654, which comes more and more clear to the sight of all men as the years unfold before us: "The rapid multiplication of these bodies, their resources and far-reaching ambition, their ubiquity and vast combinations, all moved and directed by concentrated power and talent, constitute them a distinct and almost independent and over-shadowing power in our governments, and in fact the great social and political problem of the age. Whether they shall control the government or government shall control them, are questions that are forcing themselves upon public attention and fast assuming practical importance. They should and will be maintained in the exercise of all their essential and legitimate powers as necessary and useful institutions of modern civilization. But if in addition to the dangerous power of transferring all their property and franchises to anybody and anywhere, it should also be held that their corporate powers are such contracts as put them beyond the reach of all legislative check or control in the interest of society, then the problem will have been solved. The government, in my opinion, will have abdicated its sovereignty, heretofore supposed to be inalienable, and society will be left without protection to *chartered irresponsibility.*"